[Cite as *Watts v. Fledderman*, 2018-Ohio-2732.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

LOUISE E. WATTS,                              :          APPEAL NO. C-170255
                                                         TRIAL NO.  A-1603834
     Plaintiff-Counterclaim                :
     Defendant-Appellee,

                        :          *O P I N I O N.*

  vs.

                        :

ANNE M. FLEDDERMAN,
Executor of the Estate of                     :
Thomas A. Fledderman, Deceased,
                                              :
  and
                                              :
ANNE M. FLEDDERMAN,
                                              :
     Defendants-Counterclaim
     Plaintiffs-Appellants,                :

  and                                        :

ANNE M. FLEDDERMAN,                           :
Escrow Agent, et al.,
                                              :
     Defendants.
                                              :

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  July 13, 2018

*G. Robert Hines*, for Plaintiff-Counterclaim Defendant-Appellee,

*Anne M. Fledderman,* for Defendants-Counterclaim Plaintiffs-Appellants.

**DETERS, Judge.**

{¶1}     This appeal involves a dispute over the proceeds of a parcel of real property that was sold in April 2016.  Plaintiff-counterclaim defendant-appellee Louise Watts filed a claim for a declaratory judgment asserting that she was entitled to the sale proceeds because she was the record owner of the property when it was sold.  Defendants-counterclaim plaintiffs-appellants Anne M. Fledderman, individually and in her capacity as the executor of the estate of the decedent, Thomas A. Fledderman, filed an answer and two counterclaims.

{¶2}     Fledderman asserted that the decedent Thomas Fledderman was the equitable owner of the property by virtue of an oral land contract that Watts and her deceased husband, John Watts, had entered into with Thomas Fledderman on March 11, 1998.  Alternatively, she argued that if the decedent Thomas Fledderman had resided in the property as a tenant from March 1998 until October 2015, the Wattses had breached what she claimed was a residential lease agreement by collecting payments in excess of the lease agreement and by charging the decedent for expenses and obligations that were the Wattses' statutory responsibility under R.C. Chapter 5321, Ohio's Landlord-Tenant Act.  Following a bench trial, the trial court rendered judgment in favor of Watts on her claim and Fledderman's counterclaims.

{¶3}     Fledderman raises five assignments of error, contending that the trial court erred by (1) denying her motion for default judgment on her counterclaims and granting Watts's motion to file her answer out of time, (2) adopting verbatim Watts's proposed findings of fact and conclusions of law, (3) dismissing her counterclaims with prejudice, and (4) admitting hearsay evidence and rendering a judgment for Watts that was contrary to manifest weight of the evidence.  Finding none of her assignments of error meritorious, we affirm the judgment of the trial court.

### Background

{¶4}   In 1998, Thomas Fledderman was operating an antique furniture and antique art pottery retail business in Mt. Healthy.  When his landlord demanded possession of the retail space and the second-floor apartment that Thomas Fledderman had occupied, Thomas Fledderman attempted to purchase a commercial storefront building located on Spring Grove Avenue in the city of Cincinnati, Ohio. When Fledderman lacked he creditworthiness to do so, his good friend, John Watts offered to purchase the building and rent the building it to Thomas Fledderman so that he could continue operating his business.

### The Wattses' Purchase of the Property

{¶5}   In February 1998, John Watts entered into a purchase contract for the property with Paul G. Schoenharl for $60,000.  John and Louise Watts obtained a $48,000 mortgage from the North Side Bank and Trust Company using their own credit and an unsecured $20,000 interest-free loan from Thomas Fledderman's parents, Raymond and Betty Fledderman. The $20,000 interest-free loan from Raymond and Betty Fledderman to John and Louise Watts was memorialized by a promissory note dated February 12, 1998, which stated,

> 1. Payment of [the] principal shall be made only upon the sale of the real property located at 3940 Spring Grove Avenue, Cincinnati, Ohio 45223 and only if the property is sold to someone other than Thomas A. Fledderman.  It is the intention of the Makers and the Payees of this note that Thomas A. Fledderman shall purchase the within described real estate at some future date from Makers for the sum of $40,000.00 at which time and upon which occurrence this note shall become void.

{¶6}   On March 9, 1998, the real estate closing for the property was held at North Side Bank and Trust. Paul Shoenharl's deed to John and Louise Watts, in survivorship, was recorded on March 11, 1998.

### The Commercial Lease Agreement

{¶7}   On March 26, 1998, John and Louise Watts, as lessors, and Thomas Fledderman, as lessee, entered into a lease agreement for the entire commercial storefront building located on the property.   The lease agreement was executed at North Side Bank and Trust and witnessed by two bank employees.   Under the terms of the lease agreement, Thomas Fledderman agreed to pay rent in the amount of $650 per month.

{¶8}   Paragraph 4 of the lease contained a right to purchase the property for the sum of $40,000.00 that was nearly identical to that contained in the Wattses' promissory note to Raymond and Betty Fledderman:

4.   Lessee shall have the right to purchase the real estate at 3940 Spring Grove Avenue, Cincinnati, Ohio 45223 from Lessor for the sum of $40,000.00 at any time during the term of this agreement. Should Lessee decide to exercise his right to purchase the real estate for the sum of $40,000.00, then it is understood by the parties hereto that a promissory note in the sum of $20,000.00 between Lessor (John F. Watts and Louse E. Watts) and [(] Raymond A. Fledderman and Betty Fledderman) shall become void.

Lessor retains the right to sell the real estate to any other prospective purchaser at any time during the terms of this lease.  If Lessor receives an offer to purchase the premises during the term of the Lease, or any renewal thereof, Lessee shall have the first right to

purchase said property for the sum of $40,000.00. In addition, if Lessor grants an option to purchase, at such time, Lessee may elect to proceed under the right of first refusal to purchase the Premises for the sum of $40,000.00. Lessee shall have fifteen (15 days) from receipt of said offer in which to signify his intention to exercise his right of refusal to purchase the Premises, otherwise he waives such right.

{¶9}    The lease itself used terms consistent with commercial activity such as business and merchandise and it referred to the lessee's continued operation at the leased premises. Additionally, in paragraphs 5 through 11, and 14 of the lease agreement, Thomas Fledderman, as lessee, assumed obligations consistent with a commercial lease. As lessee he was required to fully maintain the premises at his sole expense, including the driveways and public walkways included in or adjacent to the premises, and to keep them free of all obstructions, including merchandise. As the lessee he was also required to pay for all utilities and rubbish removal, to carry insurance on the premises, including "plate glass" insurance and public liability insurance of not less than $1 million, and to obtain all licenses necessary to conduct his business. The lease further provided that any expansion of the lessee's facilities or any new services acquired by the lessee would be installed at the lessee's expense and that the lessee needed to obtain the lessor's permission before making any structural alterations to the premises with the exception of trade fixtures, machinery, equipment, and furniture the lessee owned.

### Thomas Fledderman's Commercial Tenancy

{¶10} Immediately thereafter, Thomas Fledderman began operating his business selling antique furniture and antique art pottery on the first floor of the building. The business operated by appointment only. It was compliant with the B-4

5

business zoning of the area, which permitted a second-floor apartment to be operated within the commercial building, which Thomas Fledderman occupied himself.

{¶11} After Thomas Fledderman took sole occupancy of the property, the Wattses deposited all of Thomas Fledderman's rental payments into a "management account" at Northside Bank and Trust Company, out of which the mortgage payment, real-estate taxes, and insurance premiums were paid. Despite it being Fledderman's obligation, the Wattses also paid other maintenance expenses out of this account. The landlord-tenant arrangement between the Wattses and Thomas Fledderman continued without any problems. In 2003, the Wattses applied for and received a $20,000 grant made available to commercial buildings by the city of Cincinnati through the Northside Community Council, which they used to completely renovate the exterior of the building by installing a new façade and windows.

{¶12} John Watts died on September 12, 2012. His interest in the real estate passed to Louise Watts under the survivorship deed. Louise Watts continued to manage the property and to act as Thomas Fledderman's landlord by handling the receipt of all the rents and the payment of all the expenses in the same fashion as John Watts had undertaken for the previous 14 years. At no point during this time period did Thomas Fledderman exercise his right under the commercial lease agreement to purchase the property for $40,000.

### Louise Watts's Sale of the Property and the Ownership Dispute

{¶13} On October 5, 2015, Thomas Fledderman died. His sister, Anne Fledderman, as the executor of his estate, began inspecting and removing the entire inventory from his business operations and his personal property from the building.

At the same time, Louise Watts began renovations and repairs preliminarily to listing the real estate for sale. In early 2016, Louise Watts listed the property with Comey & Shepherd Realtors. On March 10, 2016, she accepted a contract to purchase the property from South Block Properties, Ltd., for the sale price of $65,000.

{¶14} In late March 2016, during a title examination that was completed preliminarily to the sale of the property to South Block Properties, Ltd., it was discovered that on February 16, 2016, Anne Fledderman, individually, had recorded pursuant to R.C. 5301.25 an affidavit asserting that Thomas Fledderman and consequently, Anne Fledderman, as his successor, owned an equitable interest in the property under an oral land contract with John and Louise Watts.

{¶15} To complete the sale of the property with South Block Properties, Ltd., Louise Watts entered into an escrow agreement with Anne Fledderman, as executor of the estate of Thomas A. Fledderman, deceased. The escrow agreement provided that deeds be delivered at the April 13, 2016 closing both from Louise Watts and from Anne Fledderman in her two separate capacities, and that the net proceeds from the closing be escrowed until a declaratory judgment action could determine the person entitled to the monies. The sale of the property to South Block Properties closed on April 13, 2016. Louise Watts deposited the net sale proceeds of $52,949.85 with Martha C. Dourson and Anne M. Fledderman, as escrow agents, in an account at North Side Bank and Trust Company.

{¶16} On June 10, 2016, Anne Fledderman, as executor of the estate of Betty C. Fledderman, sent a letter to Louise Watts demanding immediate payment of the $20,000.00 principal amount due under the February 12, 1998 promissory note, which Anne Fledderman claimed had been triggered by the April 13, 2016 sale of the property. Louise Watts authorized Martha Dourson and Anne Fledderman, the

7

escrow agents, to pay to Anne Fledderman, being both the duly appointed executor of the estate of Betty Fledderman and the nominated administrator and commissioner of the estate of Raymond Fledderman, two separate $10,000 checks from the escrow account, in full payment of all the obligations under the February 12, 1998 promissory note. Anne Fledderman and Martha Dourson held the remaining $32,949.85 net sale proceeds from the sale of the property in the Northside Bank escrow account.

### The Lawsuit

{¶17} On July 5, 2016, Louise Watts filed her complaint for declaratory judgment and money, asserting that she was entitled to the remaining $32,949.85 in proceeds from the sale of the real property. Fledderman filed an answer and a counterclaim demanding similar declaratory relief. Fledderman asserted the right to the sale proceeds under an oral land contract between Thomas Fledderman and the Wattses. Alternatively, she sought a money judgment for amounts collected by John and Louise Watts in contravention of what she claimed was a residential lease agreement and for alleged statutory violations of Ohio's Landlord-Tenant Act.

{¶18} Following a case management conference with the court, Fledderman subsequently filed a motion for default judgment on her counterclaims. Watts filed a motion for leave to answer out of time. The trial court granted Watts's motion for leave to answer out of time and denied Fledderman's motion for default judgment. The parties' claims were then tried to the court.

{¶19} Thereafter, the trial court granted judgment in favor of Louise Watts on her claim and dismissed Fledderman's counterclaims with prejudice. Fledderman filed a request for findings of fact and conclusions of law. The trial court asked Watts, as the prevailing party, to submit proposed findings of fact and conclusions of

law. Fledderman filed objections to Watts's proposed findings of fact and conclusions of law. Following a hearing on the objections, the trial court adopted Watts's findings of fact and conclusions of law. For ease of discussion, we address Fledderman's assignments of error out of order.

### *Findings of Fact and Conclusions of Law*

{¶20} In her second assignment of error, Fledderman argues that the trial court erred by adopting verbatim Watts's proposed findings of fact and conclusions of law without a thorough review and without regard to whether the findings were accurate or met the applicable standard.

{¶21} As an initial matter, we note that Watts's proposed findings of fact and conclusions of law were not filed with the trial-court clerk or attached to Fledderman's objections. Thus, we cannot determine from the record if the trial court adopted them verbatim as Fledderman claims or made minor changes as Watts contends.

{¶22} Nonetheless, Civ.R. 52 does not prohibit a trial court from adopting verbatim a party's proposed findings of fact and conclusions of law, as long as the court "has thoroughly read the document to ensure that it is completely accurate in fact and law." *Hinkston v. The Finance Co.*, 1st Dist. Hamilton No. C-980972, 2000 WL 569559, *2 (May 12, 2000). Given that the trial court held a hearing on Fledderman's objections to the proposed findings of fact and conclusions of law before adopting them, and the proposed findings of fact and conclusions accurately reflected the record and the law, we cannot say the trial court erred by adopting them. *See In re Norris*, 4th Dist. Athens Nos. 00CA038 and 00CA041, 2000 WL 33226187, *6 (Dec. 12, 2000). We, therefore, overrule the second assignment of error.

### *Fledderman's Counterclaim for Oral Land Contract*

{¶23} In her third assignment of error, Fledderman argues that the trial court erred by dismissing with prejudice her counterclaim for a declaratory judgment that Thomas Fledderman had entered into an oral land contract with the Wattses upon their purchase of the building.

{¶24} An agreement concerning the sale of an interest in real estate generally falls within R.C. 1335.05, Ohio's statute of frauds, and must be memorialized in writing. *See Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 438-439, 662 N.E.2d 1074 (1996). Notwithstanding the statute of frauds, Ohio courts have held that it is possible in certain cases to establish the existence of "an oral land contract" under the doctrine of part performance. *Roth v. Natl. City Bank*, 1st Dist. Hamilton No. C-100216, 2010-Ohio-5812, ¶ 14. A party seeking to enforce an oral land contract must establish both the contract and the applicability of the doctrine of part performance by clear and convincing evidence. *See Geiger v. Geiger,* 2d Dist. Montgomery No. 13841, 1993 WL 476247, *2 (Nov. 16, 1993). In order to establish part performance, the party asserting it must have undertaken acts that (1) were exclusively referable to the oral agreement to convey land and (2) changed his position to his prejudice. *Id.* at *4; *Alban v. Schnieders*, 67 Ohio App. 397, 399, 34 N.E.2d 302 (1st Dist.1940).

{¶25} Fledderman claims that she established the existence of an oral land contract under the doctrine of part performance because she presented clear and convincing evidence that Thomas Fledderman had occupied the building for 17½ years with the approval of the Wattses, he had made rental payments in excess of the value of the property, which the Watts had used to pay the mortgage on the property, and he paid all the maintenance expenses for the property. We disagree.

{¶26} Here, the clear and unambiguous terms of the February 12, 1998 promissory note and the commercial lease agreement reflect that the Wattses were the owners of the property, and that Thomas Fledderman was a tenant of the property. The Wattses retained the right to sell the property, and if they decided to exercise that right, then Thomas Fledderman had a right of first refusal to purchase the property for $40,000. Fledderman's reliance on the doctrine of part performance is misplaced as these written documents are presumed to contain the terms of the parties' agreement. *See Marion Prod. Credit Assn. v. Cochran*, 40 Ohio St.3d 265, 533 N.E.2d 325 (1988), paragraph three of the syllabus (holding that "an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms"). Thomas Fledderman's actions during the 17½ years he resided in the property were not based on any oral agreement between himself and the Wattses, but on his obligations as a lessee of the property.

{¶27} Because Fledderman's position that Thomas Fledderman had entered into an oral land contract with the Wattses is totally inconsistent with the clear and unambiguous terms of the promissory note and the lease agreement, the trial court properly dismissed her counterclaim with prejudice. As a result, we overrule the third assignment of error.

### *Fledderman's Counterclaim for Breach of Residential Lease Agreement*

{¶28} In the fourth assignment of error, Fledderman argues that the trial court erred by dismissing her counterclaim for breach of a residential lease agreement and for reimbursement of amounts paid by Thomas Fledderman during the tenancy that the Wattses had been required to pay.

**{¶29}** At trial, Fledderman contended that the lease agreement executed between the Wattses and Thomas Fledderman on March 26, 1998, violated the provisions of the Ohio Landlord-Tenant Act set forth under R.C. Chapter 5321. She claimed that because the lease had lacked a purpose clause, and because Thomas Fledderman had lived in an apartment on the second floor and used the basement and first floor for storage, the commercial building was actually a "residential premises," and that certain provisions of the Ohio Landlord-Tenant Act had been continually violated from March 1998 until Thomas Fledderman's death.

> Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement. * * * Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions. * * * When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.

*Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992); *see F & R Ent. v. Phillips*, 2d Dist. Montgomery No. CA 11711, 1990 WL 68968, *2 (May 21, 1990).

**{¶30}** Here, the trial court concluded that the clear and unambiguous terms in the March 26, 1998 lease agreement evidenced that it was a commercial lease agreement for the entire commercial property. For example, the lease agreement used terms consistent with commercial activity, such as merchandise, inventory, trade fixtures, furniture, equipment, and machinery, and it referenced Thomas

Fledderman's continued operation at the leased premises. Thomas Fledderman, furthermore, undertook duties consistent with a commercial tenant. For example, he agreed to maintain public liability and "plate glass" insurance on the premises, to obtain all required licenses to conduct his business, and to fully maintain the premises at his own expense. The court further found that Louise Watts's testimony, the lease provisions, photographs of the real estate, and the façade grant awarded to the Wattses for improving North Side commercial buildings, constituted persuasive evidence that the real estate had been used for commercial purposes, and that incidental and secondary to that use was Thomas Fledderman's permissive use of the second-floor apartment within the commercial building.

{¶31} R.C. Chapter 5321 does not apply to landlords and tenants of commercial property. And the rent and maintenance obligations that Thomas Fledderman undertook were consistent with his duties under the commercial lease agreement. Thus, the trial court properly concluded that Fledderman's counterclaim for statutory landlord-tenant violations was meritless. *See, e.g., Maggiore v. Kovach*, 101 Ohio St.3d 184, 2004-Ohio-722, 803 N.E.2d 790, ¶ 18 (holding that R.C. Chapter 5321 encompasses only tenants and landlords of residential properties). As a result, we overrule the fourth assignment of error.

### *Weight of the Evidence*

{¶32} In her fifth assignment of error, Fledderman argues that the trial court's judgment was against the manifest weight of the evidence and that the court abused its discretion in admitting hearsay into evidence.

{¶33} In a manifest-weight-of the evidence challenge, this court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its

way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. "[I]n weighing the evidence, [we] must always be mindful of the presumption in favor of the finder of fact," particularly when the trial court has issued findings of fact and conclusions of law pursuant to Civ.R. 52. *See Busch Bros. Elevator Co., Inc. v. Unit Bldg. Servs.*, 190 Ohio App.3d 413, 2010-Ohio-5320, 942 N.E.2d 404, ¶ 3 (1st Dist.).

{¶34} Here, the trial court, sitting as the trier of fact, heard testimony from Louise Watts, Anne Fledderman, and Fledderman's two witnesses, Mark Ireton and Susan Thompson, and it reviewed numerous documents relating to the property. Fledderman maintains that the trial court lost its way in choosing to accord more weight to Watts's testimony than to the testimony of herself and her witnesses that Thomas Fledderman had used the property as his residence and to store the pottery, antiques, furniture, computers, and other items that he had collected. She additionally claims that the trial court erred in admitting hearsay in the form of a 1999 report from the Northside Business Association naming Thomas Fledderman's business as the Business of the Month. But any error in admitting that document was harmless, when the trial court had sufficient evidence independent of that document to support its conclusion that Thomas Fledderman had operated a business on the premises. Here, the trial court's decision rested primarily on the clear and unambiguous language in the promissory note and commercial lease agreement which conclusively established the issue. Watts's testimony was consistent with that documentary evidence. Based upon our review of the record, we cannot say that the trial court's decision is contrary to the weight of the evidence. We, therefore, overrule the fifth assignment of error.

### *Default Judgment*

**{¶35}** In her first assignment of error, Fledderman argues that the trial court erred by denying her motion for a default judgment on her counterclaims and by permitting Watts to file her answer out of time.

**{¶36}** "A trial court's decision to either grant a default judgment in favor of a moving party or to allow the defending party to file a late answer pursuant to Civ.R. 6(B) upon a finding of excusable neglect will not be reversed absent an abuse of discretion." *Huffer v. Cicero*, 107 Ohio App.3d 65, 73, 667 N.E.2d 1031 (4th Dist.1995). An abuse of discretion involves more than an error of law or of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable or arbitrary. *Rock v. Cabral,* 67 Ohio St.3d 108, 112, 616 N.E.2d 218 (1993).

**{¶37}** Civ.R. 6(B)(2) allows for an extension of time to file a late pleading within the trial court's discretion "upon motion made after the expiration of the specified period * * * where the failure to act was the result of excusable neglect * * *." The "test for excusable neglect under Civ.R. 6(B)(2) is less stringent than that applied under Civ.R. 60(B)." *State ex rel. Lindenschmidt v. Bd. of Commrs. of Butler Cty.*, 72 Ohio St.3d 464, 466, 650 N.E.2d 1343 (1995). In determining whether neglect is excusable or inexcusable, courts "must take into consideration all the surrounding facts and circumstances and * * * be mindful * * * that cases should be decided on their merits, where possible, rather than procedural grounds." *Id.* Under the plain language of Civ.R. 55, a default judgment is appropriate only where a party has failed to plead or otherwise defend.

**{¶38}** Based on our review of the record, we cannot conclude that the trial court abused its discretion by denying Fledderman's motion for a default judgment and granting Watts's motion for leave to answer out of time given the unusual

procedural posture of this case, the admonition that cases should be decided on the merits, and the less stringent standard for excusable neglect in Civ.R. 6(B)(2).

{¶39} Here, Fledderman's counterclaims demanded the opposite declaratory relief that Watts had already sought in her declaratory judgment claim. Thus, Fledderman cannot demonstrate any prejudice from the court's permitting Watts to file her answer out of time. Judicial economy, moreover, warrants litigating all issues surrounding the property in a single action. Watts filed her combined motion in response to Fledderman's motion for a default judgment and she moved to file an answer to the counterclaim within nine days of being served with the motion for a default judgment. Thus, Watts's counsel cannot be said to have flagrantly disregarded the civil rules. Consequently, we cannot say the trial court abused its discretion by granting Watts's motion to answer out of time or in denying Fledderman's motion for a default judgment. *See Stumpff v. Harris*, 2d Dist. Montgomery No. 23354, 2010-Ohio-1241, *5. As a result, we overrule the first assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**MYERS, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.