[Cite as *Ltd. Invest. Group Corp. v. Huntington Natl. Bank*, 2022-Ohio-3657.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Limited Investment Group Corp., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 21AP-61 |
| v. | : | (C.P.C. No. 10CV-3000) |
| Huntington National Bank et al., | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |
| Franklin County Treasurer [Cheryl Brooks Sullivan], | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 21AP-62 |
| v. | : | (C.P.C. No. 12CV-1454) |
| Limited Investment Group Corp. et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| Huntington National Bank, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 21AP-63 |
| v. | : | (C.P.C. No. 12CV-1602) |
| Limited Investment Group Corp. et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| Huntington National Bank, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 21AP-64 |
| v. | : | (C.P.C. No. 12CV-6175) |
| Limited Investment Group Corp. et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on October 13, 2022

**On brief:** *Timothy J. Ryan*; *Kevin R. Nose*; and *Kevin E. Humphreys*, for appellant. **Argued:** *Kevin E. Humphreys.*

**On brief:** *Dinsmore & Shohl, LLP*, *William M. Mattes*, *Katherine A. Rasmussen*, and *Justin M. Burns*, for appellee The Huntington National Bank. **Argued:** *William M. Mattes.*

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Appellant, The Limited Investment Group Corporation, appeals a judgment of the Franklin County Court of Common Pleas in favor of appellee, The Huntington National Bank. For the following reasons, we affirm that judgment.

{¶ 2} In 2003, Ashraf Ettayem formed Limited to acquire and rehabilitate commercial properties in Columbus, Ohio. Ettayem was the president and sole shareholder of Limited. In 2005, Limited purchased a shopping center located at 3150 Allegheny Avenue for approximately $400,000. When Limited purchased the shopping center, four tenants occupied it. By 2007, only one remaining tenant rented 1,000 square feet of the 27,000 square feet of available space.

{¶ 3} In January 2008, Ettayem requested that Huntington extend a loan to Limited for the purpose of rehabilitating and remodeling the Allegheny shopping center. Huntington agreed to loan Limited $900,000. On October 1, 2008, the parties executed the loan documents. Those documents included: (1) a Business Loan Agreement; (2) a Promissory Note in the original amount of $900,000; (3) Open-End Mortgages on the Allegheny shopping center, and on a second property Limited owned, 329 South Central Avenue; (4) a Disbursement Request and Authorization; and (5) an Agreement to Provide Insurance.

{¶ 4} The Promissory Note stated that it "evidence[d] a straight line of credit." (Limited's Ex. 20.) Although the principal amount of the loan was $900,000, Limited did not have to request the disbursal of the entire $900,000. The Promissory Note only obligated Limited to repay "so much [of the principal amount] as may be outstanding, together with interest on the unpaid principal balance of each advance." *Id.*

{¶ 5} The Business Loan Agreement contemplated both initial and subsequent advances of loan funds. Each request for the advancement of funds had to satisfy the conditions precedent contained in the Business Loan Agreement. The conditions precedent included the requirement that Limited provide Huntington specified documents, such as security agreements and financing statements, as well as the requirement that Limited provide "such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require." (Limited's Ex. 19.)

{¶ 6} After the signing of the loan documents, Huntington immediately disbursed approximately $535,000 of loan funds. The disbursed funds paid off a promissory note, which was secured by a mortgage encumbering the Allegheny property; a second promissory note, which was secured by a mortgage encumbering the Central Avenue property; a line of credit with another bank; and credit card debt. Because the principal amount of the loan was $900,000, approximately $365,000 remained available to Limited for the rehabilitation of the Allegheny shopping center.

{¶ 7} In November 2008, Ettayem sent Huntington loan officer Travis Sanders a copy of a work proposal for the rehabilitation of the Allegheny shopping center in the amount of $146,910. Ettayem requested the disbursement of loan proceeds in the amount of the proposal. Sanders, however, informed Ettayem that Limited would have to submit certain forms in order to receive a disbursement of funds for the rehabilitation of the property. Sanders had given Ettayem copies of the necessary forms on October 1, 2008 when the parties signed the loan documents.

{¶ 8} The required forms consisted of documents entitled "Application and Certificate for Payment" and "Continuation Sheet,"[1] as well as a mechanic's lien waiver form. (Huntington's Ex. U.) The AIA forms allow a contractor to apply for partial payment

---

[1] The American Institute of Architects ("AIA") created both of these forms, and the AIA designates them "AIA Document G702" and "AIA Document G703." We will refer to them as the "AIA forms."

after completion of a phase of work by providing evidence of the percentage of rehabilitation work completed. Huntington required the mechanic's lien waiver form to ensure that no mechanic's liens would affect the bank's collateral.

{¶ 9} Sanders told Ettayem that Huntington only disbursed funds based upon rehabilitation work completed in phases throughout the project. Consequently, Huntington refused to advance to Limited $146,910 based solely upon a contractor's work proposal.

{¶ 10} The Promissory Note established a draw period during which Limited could request the disbursement of loan proceeds from Huntington. Specifically, the Promissory Note provided, "**Draw period**. The proceeds of the loan evidenced hereby may be advanced in partial amounts during the term hereof and prior to maturity, and no partial advance shall be made after March 28, 2009." (Emphasis sic.) (Limited's Ex. 20.) Limited never submitted to Huntington the necessary forms for an advance for rehabilitation work prior to the expiration of the draw period on March 28, 2009. Huntington, therefore, did not disburse to Limited any funds for the rehabilitation of the Allegheny shopping center.

{¶ 11} The terms of the Promissory Note required Limited to begin making monthly payments of both principal and interest beginning on April 28, 2009. Limited made the required payments for three months. In July 2009, Ettayem attended a meeting with Sanders and another Huntington representative. The Huntington employees told Ettayem that Huntington would not extend the draw period or disburse the remaining loan proceeds. After that meeting, Limited began submitting interest-only loan payments to Huntington.

{¶ 12} Due to Limited's noncompliance with its payment obligations, Huntington sent Limited monthly invoices reflecting a past due balance. Huntington also transferred responsibility for oversight of the loan to Scott Rudawsky in Huntington's Special Assets Division in early October 2009. Shortly after receiving oversight responsibility for Limited's loan, Rudawsky discovered that a fire had significantly damaged the Allegheny shopping center on or about May 6, 2009. As a result of the fire, Ettayem had received an insurance proceeds check from State Auto Insurance in the amount of $139,861.82 made payable to Limited and Huntington. In October 2009, Ettayem delivered that check to a

local Huntington branch, and Rudawsky learned about the fire after the check landed on his desk.

{¶ 13} Huntington had difficulties communicating with Ettayem concerning the fire and the endorsement of the check. Ultimately, Huntington endorsed the check on its own behalf and as attorney in fact for Limited. Huntington then applied the insurance proceeds to Limited's outstanding indebtedness and reduced the principal amount due and owing on the loan.

{¶ 14} On February 10, 2010, after Limited had failed to properly pay on the loan for eight months, Huntington sought a cognovit judgment against Limited in case No. 10 CV 2264 in the Franklin County Court of Common Pleas. The trial court granted Huntington a cognovit judgment in the amount of $381,190.59, plus interest, late fees and charges, and attorney fees, on February 17, 2010.

{¶ 15} On February 25, 2010, Limited filed suit against Huntington for breach of contract, fraud, and conversion in case No. 10 CV 3000. Limited alleged that Huntington: (1) breached the loan documents by failing to disburse the totality of the loan funds, (2) misrepresented that it would disburse the entire loan amount when it never intended to do so, and (3) converted the $139,861.82 insurance proceeds check.

{¶ 16} At the same time it filed its complaint, Limited moved for a preliminary injunction ordering Huntington to give Limited the fire insurance proceeds. While the trial court did not grant Limited the exact relief it sought, the trial court decided the motion in Limited's favor. In a judgment dated December 19, 2011, the trial court ordered Huntington to deposit $139,851.82[2] with the Franklin County Clerk of Courts until the court could resolve who the money belonged to.

{¶ 17} On February 6, 2012, the Franklin County Treasurer filed a foreclosure action against Limited in case No. 12 CV 1454 with regard to the Allegheny property. The complaint named Huntington as a defendant. Huntington filed a cross-claim against Limited that also sought foreclosure and, in addition, asked for the appointment of a

---

[2] This amount was $10 less than the amount of the insurance proceeds check but, apparently, no party alerted the trial court to this discrepancy.

receiver.[3]  The trial court appointed a receiver for the Allegheny property on February 26, 2012.

{¶ 18}  On February 8, 2012, Huntington filed a foreclosure action against Limited in case No. 12 CV 1602 with regard to the Central Avenue property.  Again, Huntington requested a receiver.  The trial court appointed a receiver for the Central Avenue property on February 15, 2012.  With the trial court's approval, the receiver sold the Central Avenue property on August 29, 2012.  The receiver deposited the proceeds of the sale, $109,859.36, into his escrow account.[4]

{¶ 19}  On Limited's motion, the trial court consolidated Limited's action against Huntington (No. 10 CV 3000) with the two foreclosure actions (case Nos. 12 CV 1454 and 12 CV 1602).  The consolidated case also included case No. 12 CV 6175, a creditor's bill action Huntington filed against Limited to reach Limited's interest in a check in the amount of $40,440.07 issued by State Auto Insurance as a result of the fire.

{¶ 20}  On August 30, 2012, Limited moved to vacate the cognovit judgment granted against it in case No. 10 CV 2264.  The trial court granted the motion because the attorney confessing judgment failed to present the original warrant of attorney to the court at the time the attorney made the confession pursuant to R.C. 2323.13(A).  After vacating the February 17, 2010 judgment, the trial court granted the attorney confessing judgment 14 days to produce the original warrant of attorney.  The attorney complied with the trial court's order.  Consequently, on February 27, 2013, the trial court granted Huntington a cognovit judgment in the amount of $521,052.41, plus interest, late fees and charges, and attorney fees.  The amount of damages owed increased from $381,190.59 to $521,052.41 because Huntington had to pay to the Franklin County Clerk of Courts the fire insurance proceeds originally applied to the loan balance.

{¶ 21}  The trial court tried the consolidated cases in a bench trial in late January 2017.  In the findings of fact and conclusions of law issued on November 13, 2017, the trial

---

[3]  On January 20, 2017, the treasurer voluntarily dismissed his complaint, leaving Huntington's cross-claim pending.

[4]  In July 2017, the receiver admitted to the trial court that he had unlawfully removed funds from his escrow account and loaned them to another individual.  The trial court found both the receiver and the borrower of the funds in contempt of court and ordered them to repay the funds.  On the trial court's orders, they deposited a total of $149,503.38 with the Franklin County Clerk of Courts.

court awarded judgment in Huntington's favor in each of the four actions before it. The trial court further found that Huntington was entitled to reasonable attorney's fees under the Promissory Note, but did not determine the amount of fees due. Additionally, the trial court concluded that Limited could not collaterally attack the cognovit judgment entered in case No. 10 CV 2264, and that Huntington was "entitled to recover the full amount of the Cognovit Note in the amount of $1,374,413.88 (interest per diem $97.69733)." (Nov. 13, 2017 Findings of Fact and Conclusions of Law at ¶ 267.)

{¶ 22} Ultimately, the trial court awarded Huntington $928,593.73 in attorney's fees and expenses. Moreover, on June 4, 2020, the trial court issued an order confirming the sale of the Allegheny property and distributing the proceeds of that sale.

{¶ 23} Limited now appeals to this court, and it assigns the following errors:

> [1.] THE TRIAL COURT ERRED IN ITS WHOLESALE ADOPTION OF THE 268 PARAGRAPHS OF [HUNTINGTON]'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW.
>
> [2.] THE TRIAL COURT ERRED IN THE INTERPRETATION OF THE PARTIES' BUSINESS LOAN AGREEMENT.
>
> [3.] THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE AT TRIAL OF THE TERMS WITHIN [HUNTINGTON]'S CONSTRUCTION LOAN AGREEMENT AND CONSTRUCTION MORTGAGE.
>
> [4.] THE TRIAL COURT ERRED IN ITS CONCLUSIONS REGARDING THE EFFECT OF [HUNTINGTON]'S COGNOVIT JUDGMENT.
>
> [5.] THE TRIAL COURT ERRED IN ENTERING JUDGMENT IN FAVOR OF [HUNTINGTON] RATHER THAN AWARDING JUDGMENT AND DAMAGES IN FAVOR OF [LIMITED] AGAINST [HUNTINGTON].

{¶ 24} We will begin our analysis with Limited's second assignment of error. By that assignment of error, Limited argues that the trial court erred in interpreting the loan documents to condition the disbursement of advances for rehabilitation work on the submittal of forms specified by Huntington. We disagree.

{¶ 25} The interpretation of a written contract is a matter of law that a court reviews de novo. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, ¶ 9. When confronted

with a question of contractual interpretation, a court's principal objective is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. When that language is clear, a court may look no further than the writing itself to find the intent of the parties. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37. However, when that language is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 12.

{¶ 26} Whether contractual language is clear or ambiguous is a question of law for the court. *Nationwide Life Ins. Co. v. Canton*, 10th Dist. No. 09AP-939, 2010-Ohio-4088, ¶ 20. In answering that question, a court restricts its review to the four corners of the contract. *Id.* Contractual language is ambiguous if a court cannot determine its meaning from the four corners of the contract, or if the language is susceptible of two or more reasonable interpretations. *Covington v. Lucia*, 151 Ohio App.3d 409, 2003-Ohio-346, ¶ 18 (10th Dist.). Once a court finds ambiguity in a contract, a finder of fact generally undertakes the role of resolving that ambiguity. *Galatis* at ¶ 13.

{¶ 27} Courts interpret writings executed as part of the same transaction as a whole, and gather the intent of each part from consideration of the whole. *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997). Here, consequently, we must consider any relevant provisions of the Business Loan Agreement, the Promissory Note, the Allegheny Open-End Mortgage, and the Disbursement Request and Authorization.

{¶ 28} To determine whether the loan documents conditioned advances for rehabilitation work on the receipt of certain forms, the trial court looked to the section of the Business Loan Agreement entitled "Conditions Precedent to Each Advance." (Emphasis and capitalization omitted.) (Limited's Ex. 19.) That section provided:

> **CONDITIONS PRECEDENT TO EACH ADVANCE.**
> Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all the conditions set forth in this Agreement and in the Related Documents.

* * *

> * * * Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

(Emphasis sic.) *Id.*

{¶ 29} The trial court concluded that, based on this clear and unambiguous language, Limited was only entitled to advances to pay for rehabilitation work if it first submitted the documentation required by Huntington. On appeal, Limited asserts no argument attacking this interpretation of the contractual language. We concur with the trial court's conclusion that the provision at issue unambiguously conditions advances on the submittal of documentation required by Huntington.

{¶ 30} While the contractual provision at issue allows Huntington to require certain documents before disbursing loan funds for rehabilitation work, the provision does not specify what documents Huntington required of Limited. The provision, therefore, is ambiguous on that point. Consequently, the trial court could turn to extrinsic evidence to determine the type of documents Huntington required from Limited before it would advance loan funds to pay for rehabilitation work.

{¶ 31} Extrinsic evidence a trial court may consider in determining the meaning of ambiguous contract language can include: " '(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement.' " *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, ¶ 9, quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 56 (2d Dist.1998). A trial court's interpretation of ambiguous contractual language will not be overturned absent an abuse of discretion. *Campbell v. 1 Spring, LLC*, 10th Dist. No. 19AP-368, 2020-Ohio-3190, ¶ 9.

{¶ 32} Here, Huntington loan officer Travis Sanders testified that the documents Huntington required under the contractual provision at issue included the AIA forms and a mechanic's lien waiver form. Sanders testified that he gave Limited president Ashraf Ettayem copies of these documents on October 1, 2008 when the parties executed the loan documents. Sanders also testified that, in November 2008, when Ettayem sought a disbursal of loan funds to make a deposit for rehabilitation work, Sanders "reiterate[d]

[Huntington's] position to [Limited] * * *, that [Limited] needed to have the AIA documents filled out and work completed." (Tr. at 327.)  Based upon this evidence, we conclude that the trial court did not abuse its discretion in finding that the contractual provision at issue conditioned advances of loan funds for the payment of rehabilitation work on the submittal of completed AIA forms and a mechanic's lien waiver form.

{¶ 33} Limited ignores the "Conditions Precedent to Each Advance" section of the Business Loan Agreement in favor of concentrating on a different loan document—the Disbursement Request and Authorization.  Limited focuses on a section of that document that reads:

> **DISBURSEMENT        INSTRUCTIONS.**        Borrower
> understands that no loan proceeds will be disbursed until all of
> Lender's conditions for making the loan have been satisfied.
> Please disburse the loan proceeds of $900,000 as follows:
>
> **Undisbursed Funds**:            $900,000
>                                   _____
> **Note Principal**:               $900,000

(Emphasis sic.) (Limited's Ex. 31.)

{¶ 34} According to Limited, under this provision, once it complied with the conditions for the "making" of the loan, Huntington had an obligation to disburse the entire $900,000 loan amount.  Limited maintains that the AIA forms and mechanic's lien waiver form were not necessary to make the loan, and thus, the lack of those forms did not forestall Huntington's contractual duty to advance the loan funds.   We decline to adopt Limited's interpretation as it conflicts with the "Conditions Precedent to Each Advance" section.

{¶ 35} Courts must attempt to harmonize the provisions in writings executed as part of the same transaction so that each provision has effect. *Kent State Univ. v. Bradley Univ.*, 11th Dist. No. 2017-P-0056, 2019-Ohio-2088, ¶ 39; *Susany v. Guerrieri*, 7th Dist. No. 15 MA 0079, 2016-Ohio-1062, ¶ 21.  Limited, however, interprets the acknowledgement that "no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied" to curtail the "Conditions Precedent to Each Advance" section of the Business Loan Agreement.  By the clear and unambiguous terms of the Business Loan Agreement, "all" of the "Conditions Precedent to Each Advance" apply to "the initial Advance and each subsequent Advance." (Limited's Ex. 20.) Under Limited's interpretation

of the loan documents, Limited would be entitled to an advance by fulfilling only some of the conditions precedent in the "Conditions Precedent to Each Advance" section because not all of the listed conditions relate to the "making [of] the loan."

**{¶ 36}** Limited's interpretation of the loan documents contravenes the plain language of the documents. Limited was required to satisfy *all* the conditions precedent in the "Conditions Precedent to Each Advance" section before Huntington's obligation to make an advance arose. Consistent with our above analysis, to satisfy the conditions precedent, Limited had to submit the necessary forms before Huntington had to disburse loan funds for the payment of rehabilitation work. Accordingly, we conclude that the trial court did not err in interpreting the loan documents. We therefore overrule the second assignment of error.

**{¶ 37}** By the third assignment of error, Limited argues that the trial court erred in not admitting into evidence a construction loan agreement and mortgage executed by Huntington and an unrelated third party in 2005.[5] We disagree.

**{¶ 38}** Decisions regarding the admissibility of evidence are within the discretion of the trial court. *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38; *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. An appellate court will uphold such a decision absent an abuse of discretion. *Banford* at ¶ 38; *Beard* at ¶ 20. Moreover, even in the event of an abuse of discretion, an appellate court will not reverse the judgment unless the abuse materially prejudiced the complaining party. *Banford* at ¶ 38; *Beard* at ¶ 20.

**{¶ 39}** Limited contends that the agreements it sought to admit, which include explicit provisions addressing AIA forms, draw requests, and mechanic's lien waivers, demonstrate that Huntington did not intend to require Limited to submit AIA forms or mechanic's lien waiver forms to receive advances under the parties' Business Loan Agreement. However, as we explained above, "[t]he intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly*, 31 Ohio St.3d 130, at paragraph one of the syllabus. Extraneous deals with unrelated third parties, therefore, are generally irrelevant to determining the intent of the parties to the contract at

---

[5] While Limited also argues in this assignment of error that the trial court erred in not admitting exhibits 41B, 41C, 41D, or 41E, we cannot address that argument because Limited failed to ensure that our record contains those exhibits.

issue. Consequently, we conclude that the trial court did not abuse its discretion in excluding from evidence a separate and unrelated construction loan agreement and mortgage. We therefore overrule the third assignment of error.

{¶ 40} By the fourth assignment of error, Limited argues that the trial court erred in (1) allowing the cognovit judgment entered in case No. 10 CV 2264 to have a preclusive effect on Limited's claims against Huntington in case No. 10 CV 3000, and (2) rejecting Limited's collateral attack on the February 27, 2013 cognovit judgment. We find both arguments unavailing.

{¶ 41} "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' " *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Under the doctrine of claim preclusion, a final judgment rendered on the merits forecloses all subsequent actions, by the same parties or their privies, based on any claim arising out of the transaction or occurrence that was the subject matter of the previous action. *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381 (1995). Issue preclusion, on the other hand, bars relitigation of any fact or point determined by a court of competent jurisdiction in a previous action between the same parties or their privies. *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 2007-Ohio-1102, ¶ 6.

{¶ 42} In case No. 10 CV 3000, Huntington moved for summary judgment on the basis that res judicata barred Limited's claims. According to Huntington, all Limited's claims arose out of Limited's allegation that Huntington breached the Promissory Note. Huntington argued that claim preclusion prevented Limited from asserting those claims because the trial court had already issued a cognovit judgment in Huntington's favor on the Promissory Note. The trial court denied Huntington's summary judgment motion. The trial court declined to apply res judicata, finding that to do so would contravene fairness and justice as Limited could not have raised its claims in the cognovit action.

{¶ 43} Because the trial court did not give the cognovit judgment any preclusive effect in case No. 10 CV 3000, the trial court did not err as alleged by Limited. Consequently, Limited has not provided a basis on which to reverse the trial court's judgment.

{¶ 44} Next, Limited argues that the trial court erred in concluding that Limited could not collaterally attack the February 27, 2013 cognovit judgment. A collateral attack

is an attempt to defeat the operation of a judgment initiated in a proceeding where a new right derived from or through the judgment is involved. *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶ 16. Although collateral attacks are not inherently improper, Ohio law strongly disfavors them because the primary way to challenge a final judgment is through a direct appeal. *Id.* at ¶ 19, 22; *Luper Neidenthal & Logan v. Albany Station, LLC*, 10th Dist. No. 13AP-651, 2014-Ohio-2906, ¶ 15. Thus, a party may maintain a collateral attack in only two circumstances: "when the issuing court lacked jurisdiction or when the order was the product of fraud (or of conduct in the nature of fraud)." *Ohio Pyro, Inc.* at ¶ 23. "Absent either of those two grounds, a collateral attack is improper." *Bell v. Nichols*, 10th Dist. No. 10AP-1036, 2013-Ohio-2559, ¶ 21.

{¶ 45} Here, Limited contends that the February 27, 2013 cognovit judgment is void because the court that entered it lacked jurisdiction. Because Limited may mount a collateral attack under that circumstance, we must consider the merits of Limited's argument.

{¶ 46} To do so, we must review the court filings in case No. 10 CV 2264, which are not part of the records in the cases currently on appeal before this court. However, appellate courts may take judicial notice of public court records available on the internet. *State v. Estridge*, 2d Dist. No. 2021-CA-25, 2022-Ohio-208, ¶ 12, fn. 1; *Johnson v. Levy*, 10th Dist. No. 18AP-775, 2019-Ohio-3492, ¶ 5, fn. 1. As the docket and filings in case No. 10 CV 2264 are publicly available on the internet, we take judicial notice of the docket and filings in that case.

{¶ 47} According to Limited, the trial court found the February 17, 2010 cognovit judgment void for lack of subject-matter jurisdiction, so the trial court did not have subject-matter jurisdiction to enter the February 27, 2013 cognovit judgment. We disagree.

{¶ 48} Pursuant to R.C. 2323.13(A), "[a]n attorney who confesses judgment in a case, at the time of making such confession, must produce the warrant of attorney for making it to the court before which he makes the confession." This statutory provision requires the attorney confessing judgment to present the original warrant of attorney to the trial court. *Huntington Natl. Bank v. 199 S. Fifth St. Co., LLC*, 10th Dist. No. 10AP-1082, 2011-Ohio-3707, ¶ 21. Because the requirements of R.C. 2323.13(A) are jurisdictional, the

failure to present the original warrant of attorney renders any cognovit note entered void. *Id.*

{¶ 49} In case No. 10 CV 2264, the trial court found that the attorney confessing judgment had provided the court with a copied—not original—warrant of attorney at the time of the confession. Applying *Huntington National Bank*, the trial court vacated the February 17, 2010 judgment.

{¶ 50} After vacating the final judgment, the trial court reinstated case No. 10 CV 2264 for further proceedings. The trial court allowed the attorney confessing judgment to file an amended answer and present the original warrant of attorney. We find the trial court's action appropriate. *See Bronisz v. Ashcroft*, 378 F.3d 632, 637 (7th Cir.2004) ("When a [trial] court grants a Rule 60(b) motion, the effect is to vacate the previous judgment in the case. * * * Consequently, the previously filed case is reinstated and goes forward from that point."); *Fobian v. Storage Technology Corp.*, 164 F.3d 887, 890 (4th Cir.1998) ("When a [trial] court grants a Rule 60(b) motion, it must necessarily vacate the underlying judgment and reopen the record.").

{¶ 51} Limited argues, however, that the trial court did not have subject-matter jurisdiction to enter a cognovit judgment after the court reinstated the case. We are not persuaded by this argument. Due to the absence of an original warrant of attorney, the trial court lacked the authority necessary to enter the February 17, 2010 cognovit judgment. Nevertheless, the trial court always possessed the subject-matter jurisdiction necessary to adjudicate the cognovit action between Huntington and Limited.

{¶ 52} " 'Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case,' " * * * and * * * " 'the focus is on whether the forum itself is competent to hear the controversy.' " *Ostanek v. Ostanek*, 166 Ohio St.3d 1, 2021-Ohio-2319, ¶ 21, quoting *Corder v. Ohio Edison Co.*, 162 Ohio St.3d 639, 2020-Ohio-5220, ¶ 14 (first part) and *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, ¶ 19 (second part). The Ohio Constitution created the courts of common pleas and gave them original subject-matter jurisdiction over all justiciable matters as may be provided by law. Ohio Constitution, Article IV, Section 4(A) and (B). The courts of common pleas are courts of general jurisdiction and, with narrow exceptions, possess subject-matter

jurisdiction over "all civil cases in which the sum or matter in dispute exceeds the exclusive original jurisdiction of county courts."[6] R.C. 2305.01; *accord Ostanek* at ¶ 25.

{¶ 53} With regard to cognovit judgments, a "warrant of attorney shall be confessed in the municipal court having jurisdiction * * * over the subject matter; otherwise, judgment may be confessed in any court in the county where the maker or any of several makers resides or signed the warrant of attorney."[7] R.C 2323.13(A). Here, given the amount of damages sought and where the warrant of attorney was signed, the forum competent to hear the parties' dispute was the Franklin County Court of Common Pleas. That court, therefore, had subject-matter jurisdiction over the cognovit action throughout the proceedings before it.

{¶ 54} Limited also argues that case No. 10 CV 3000, which was already pending when the trial court reinstated case No. 10 CV 2264, gained jurisdictional priority over case No. 10 CV 2264. Therefore, Limited maintains, when the trial court vacated the February 17, 2010 cognovit judgment and reinstated the case, the jurisdiction-priority rule mandated that Huntington assert any claims involving the Promissory Note in case No. 10 CV 3000. According to Limited, the February 27, 2013 cognovit judgment is a nullity as it was not issued by the judge presiding over the case with jurisdictional priority. We disagree.

{¶ 55} "The jurisdictional-priority rule provides that as between state courts of concurrent jurisdiction, the tribunal whose power is first invoked acquires exclusive jurisdiction to adjudicate the whole issue and settle the rights of the parties." *State ex rel. Consortium for Economic & Community Dev. for Hough Ward 7 v. Russo*, 151 Ohio St.3d 129, 2017-Ohio-8133, ¶ 8. But that rule is not applicable to cases pending in the same court. *Id.* at ¶ 10. Consequently, the jurisdictional-priority rule did not require Huntington to transfer its cognovit action from case No. 10 CV 2264 to case No. 10 CV 3000 because both cases were pending in the Franklin County Court of Common Pleas.

---

[6] Pursuant to R.C. 1907.03(A), county courts have exclusive original jurisdiction in civil actions where the amount in controversy does not exceed $500.

[7] A municipal court has original jurisdiction only in those cases in which the amount claimed by any party does not exceed $15,000. R.C. 1901.17.

{¶ 56} In the end, Limited has not established that the February 27, 2013 cognovit judgment is void nor that the trial court gave that judgment or the February 17, 2010 cognovit judgment any preclusive effect. Accordingly, we overrule Limited's fourth assignment of error.

{¶ 57} By Limited's fifth assignment of error, it argues that the manifest weight of the evidence does not support the judgment in favor of Huntington on Huntington's foreclosure action or Limited's claims for breach of contract, fraud, and conversion. We disagree.

{¶ 58} Appellate courts will only reverse a judgment as being against the manifest weight of the evidence if it is not supported by some competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). In determining whether the record contains the necessary evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. However, when conducting its review, an appellate court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. Appellate courts give deference to the trial court's factual findings because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 59} First, Limited argues that Huntington failed to prove its entitlement to foreclose on the Allegheny Open-End Mortgage because it did not establish that it met all the conditions precedent to foreclosure. Specifically, Limited contends that Huntington failed to provide Limited with a written notice of default.

{¶ 60} Where a prior notice of default is required by a note or mortgage, the provision of that notice is a condition precedent to foreclosure. *Huntington Natl. Bank v. Haehn*, 10th Dist. No. 17AP-342, 2018-Ohio-4837, ¶ 36; *U.S. Bank N.A. v. Weber*, 10th Dist. No. 12AP-107, 2012-Ohio-6024, ¶ 12; *Natl. City Mtge. v. Richards*, 182 Ohio App.3d 534, 2009-Ohio-2556, ¶ 21 (10th Dist.). In the case at bar, the only provision referring to a notice of default appears in the Open-End Mortgage. It states:

> **NOTICES**. Any notice required to be given under this Mortgage, including without limitation any notice of default

> and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage.

(Emphasis sic.) (Limited's Ex. 21.)  Importantly, while this provision specifies the form a notice must take and when a notice becomes effective, it does not actually require Huntington to give any notice of default.  Limited has not directed this court to any other provision in the loan documents that imposes on Huntington a duty to provide a notice of default and we have not located any such provision.  We must conclude, therefore, that no such provision exists.  Consequently, in this case, the provision of a notice of default was not a condition precedent to foreclosure.

{¶ 61} Nonetheless, the trial court concluded that Huntington adduced evidence that it provided Limited with a notice of default.  The trial court based its conclusion on the testimony of Scott Rudawsky of Huntington's Special Assets Division that Huntington sent Limited a notice of default, and the testimony of Ashraf Ettayem, Limited's president, that Limited received a default letter.

{¶ 62} On appeal, Limited asserts that Huntington loan officer Travis Sanders testified that "no default notice was ever prepared."  (Appellant's brief at 41.)  Actually, Sanders testified that he did not provide Limited a notice of default, but then "[he] would never give a notice of default" [because] "[t]hat [was] way above [him]."  (Tr. at 354.)  Limited also points to another Huntington witness, who, according to Limited, "admitted that [Huntington] never called a default of [Limited's] Loan."  (Appellant's brief at 41-42.)  In fact, that witness testified that, *to the best of her knowledge*, Huntington did not send a written notice of default to Limited.  Given the shortcomings in the testimony Limited relies upon, we conclude that testimony does not outweigh Rudawsky's and Ettayem's testimony that notice did occur.

{¶ 63} In sum, we conclude that the loan documents did not include a condition precedent requiring that Huntington provide Limited with a notice of default prior to foreclosing on the mortgage.  Nevertheless, had such a condition precedent existed,

Huntington adduced competent, credible evidence that it satisfied that condition precedent by giving Limited a written notice of default before filing for foreclosure.

{¶ 64} Second, Limited argues that it provided competent, credible evidence establishing all elements of its claim for breach of contract. We disagree.

{¶ 65} "A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 41. Here, the trial court found that Limited had not proven that Huntington failed to perform when performance was due. Limited, however, contends that the record contains evidence that Huntington breached the Business Loan Agreement by not advancing loan funds to Limited for the rehabilitation of the Allegheny shopping center. According to Limited, it requested that Huntington disburse all the loan proceeds—totaling $900,000—in the document entitled "Disbursement Request and Authorization," which Ettayem signed at the loan closing. Although Huntington disbursed approximately $535,000 of loan proceeds to pay off Limited's debts, it did not disburse the remaining $365,000 to Limited to fund the rehabilitation. Limited claims this failure constitutes a breach of contract.

{¶ 66} In making its argument, Limited disregards the "Conditions Precedent to Each Advance" section in the Business Loan Agreement. A "condition precedent" is " 'a condition that must be performed before obligations in a contract become effective.' " *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d 193, 2014-Ohio-3095, ¶ 22, quoting *Coffman v. Ohio State Adult Parole Bd.*, 10th Dist. No. 12AP-267, 2013-Ohio-109, ¶ 11. If a condition precedent is not fulfilled, a party is excused from performing the duty promised under the contract. *Id.*; *accord Gilman v. Physna, LLC*, 1st Dist. No. C-200457, 2021-Ohio-3575, ¶ 19 ("An unsatisfied condition precedent excuses performance under the contract and is a defense to a breach-of-contract claim."); *Little v. Real Living HER*, 10th Dist. No. 13AP-924, 2014-Ohio-5664, ¶ 12 ("[T]he general rule is that, without the occurrence of conditions precedent, a promisor has no liability for breach of contract.").

{¶ 67} As we explained above, the "Conditions Precedent to Each Advance" section conditioned advances of loan funds for the payment of rehabilitation work on the submittal of completed AIA forms and a mechanic's lien waiver form. In the absence of the relevant

forms, Huntington had no obligation to release loan funds to Limited for the rehabilitation of the Allegheny property. Limited does not dispute that it did not submit the necessary forms in conjunction with the Disbursement Request and Authorization. Huntington, therefore, did not breach the Business Loan Agreement in not advancing the $365,000 to Limited to fund the rehabilitation.

{¶ 68} Limited directs us to testimony from Huntington witnesses that it claims proves that it was entitled to the full $900,000 as requested in the Disbursement Request and Authorization. First, Limited points to the testimony of Lisa Hefflinger, a Huntington vice president, that the documents "required for the loan" were the documents listed in a part of the "Conditions Precedent to Each Advance" section that named specific documents the borrower had to provide. (Tr. at 751-53.) Because the named documents did not include the AIA forms or a mechanic's lien waiver form, Limited argues that submittal of those particular documents was not a condition precedent to receiving the remaining $365,000 to fund the Allegheny shopping center's rehabilitation.

{¶ 69} Limited, however, cannot use a witness' testimony to interpret the clear and unambiguous terms of the Business Loan Agreement. *See Sunoco, Inc*, 129 Ohio St.3d 397, 2011-Ohio-2720, at ¶ 37 ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties."). Moreover, Limited fails to appreciate that the "Conditions Precedent to Each Advance" section contains multiple conditions precedent. Here, one condition precedent required Limited to turn over specified documents, while another conditioned advances on the submittal of documents required by Huntington. As we held above, that latter provision necessitated the submittal of the AIA forms and the mechanic's lien waiver form. Hefflinger did not testify regarding that provision.

{¶ 70} Next, Limited asserts that Scott Rudawsky testified that "the full amount of the $900,000 was going to be disbursed at closing." (Appellant's brief at 11.) Limited draws this testimony from the following exchange:

> Q: But it is your understanding, as I understand your testimony, that the expectation was when the note was entered into between the parties, that the full $900,000 was going to be disbursed, correct?

> A: Yes. The note is for $900,000. That was the agreed upon loan amount.

(Tr. at 218.)

{¶ 71}   In isolation, this exchange could mean that the parties expected the disbursal of $900,000 to occur on the date they executed the loan documents. But we must consider the context of the question and answer. Rudawsky was testifying regarding how Huntington had calculated the terms for the repayment of the loan, and he had just stated that "[t]he payment is basically saying when the loan was originated, we are assuming that $900,000 will be advanced. We don't know if the full amount will or will not, but in order to state a payment amount that is going to be due, it is assumed that the full $900,000 is advanced, and that is how payment is calculated." (Tr. at 216-17.) Thus, when Rudawsky agreed that "it [was his] understanding * * * that the expectation was when the note was entered into between the parties, that the full $900,000 was going to be disbursed," Rudawsky was affirming that, when the parties executed the loan documents, they expected that Limited would draw down the entire $900,000 loan amount over the course of the loan. (Tr. at 218.) Rudawsky did not testify that Huntington planned to disburse to Limited $900,000 at the loan closing.

{¶ 72} Limited also contends that Robert Hiss, the team leader who supervised Travis Sanders, testified that "the full amount of the loan was intended to be disbursed at the beginning of the loan." (Appellant's brief at 43.) But Hiss did not testify to that. Hiss acknowledged that a disbursement of $900,000 in response to the request in the Disbursement Request and Authorization would create an obligation to repay $900,000 in note principal. However, Hiss also stated that, "[t]o disburse [funds], [Huntington] would follow the business loan agreement[,] note, mortgage, any of the other documents." (Tr. at 821.)

{¶ 73} Finally, Limited argues that Huntington had to disburse the entire $900,000, regardless of satisfaction of the conditions precedent, because the monthly principal and interest payments due beginning on April 28, 2009 were calculated using the $900,000 amount. The loan payment structure, however, did not mandate the disbursal of the entire loan principal. As Rudawsky explained, "[t]he principal and interest payment [was] calculated on a full face value of the note, but [the monthly payment] would just pay off the

note sooner if the full amount was not disbursed." (Tr. at 216.)  Hefflinger further clarified that interest only accrued on the amount disbursed, so surplus payment resulted when a lender borrowed less than the full amount of the loan.  Huntington credited the surplus between the amount of interest as calculated/paid and the amount of interest actually owed to the principal balance.

**{¶ 74}** None of the evidence Limited points us to constitutes competent, credible evidence that Huntington breached the Business Loan Agreement.  Huntington's duty to disburse loan funds for rehabilitation work only arose if Limited submitted the necessary forms.  According to the undisputed evidence, Limited never submitted those forms. Huntington, therefore, did not have to disburse any funds.  Consequently, the manifest weight of the evidence supports the trial court's conclusion that Huntington did not breach the parties' agreement.

**{¶ 75}** Third, Limited argues that it provided competent, credible evidence establishing all elements of its fraud claim.  We disagree.

**{¶ 76}** To establish a claim for fraud, a plaintiff must prove:  (1) a representation; (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into reliance upon it; (5) justifiable reliance upon the representation; and (6) a resulting injury proximately caused by the reliance.  *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475 (1998).  As a general matter, promises or representations concerning future actions or conduct cannot serve as a basis for fraud.  *Patel v. Univ. of Toledo*, 10th Dist. No. 16AP-378, 2017-Ohio-7132, ¶ 41; *Anderson v. Baker*, 10th Dist. No. 08AP-438, 2008-Ohio-6919, ¶ 37; *Deitrick v. Am. Mtge. Solutions, Inc.*, 10th Dist. No. 05AP-154, 2007-Ohio-839, ¶ 16.  However, liability for a claim of promissory fraud arises if a party makes a promise without the present intent of performing.  *Patel* at ¶ 41; *Anderson* at ¶ 37; *Deitrick* at ¶ 16.  "When a person 'makes [a] promise of future action, occurrence, or conduct, and * * * *at the time he makes it*, has no intention of keeping his promise,' that person misrepresents his existing state of mind and present intent."  (Emphasis sic.) *Patel* at ¶ 41, quoting *Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 98 (10th Dist.2000) (further quotation omitted). " ' "Since a promise necessarily carries with it the implied assertion of an intention to

perform[,] it follows that a promise made without such an intention is fraudulent * * *. This is true whether or not the promise is enforceable as a contract." ' " *Deitrick* at ¶ 16, quoting *Applegate v. Northwest Title Co.*, 10th Dist. No. 03AP-855, 2004-Ohio-1465, ¶ 22, quoting 4 Restatement of the Law 2d, Torts, Section 530, Comment c (1977).

{¶ 77} Here, Limited bases its fraud claim on a representation contained in the February 12, 2008 letter in which Huntington informed Limited that it had approved Limited for a loan. In that letter, Huntington stated the purpose of the loan was to "[r]efiance commercial property located at 3150 Allegheny Ave.[,] Columbus, Franklin County, Ohio[,] and fund construction/rehab." (Limited's Ex. 4.) Limited argues that, at the time the parties executed the loan agreement, Huntington did not intend to "fund" the rehabilitation of the Allegheny shopping center with the loan proceeds. Rather, Limited contends, Huntington intended Limited to fund the rehabilitation and then seek reimbursement from Huntington for the money spent paying for the rehabilitation work.

{¶ 78} Limited's argument ignores an obvious alternative: Limited could hire a contractor willing to accept partial payment for work completed in phases. In such a situation, payment to the contractor could come directly from loan funds upon the submittal of the AIA forms and a mechanic's lien wavier form. This is the type of payment arrangement Huntington believed Limited would institute with its contractor, as illustrated by Travis Sanders' testimony:

> Q: Now, * * * you had discussions with Mr. Ettayem * * * relative to * * * [how] the project was going to be completed, right?
>
> A: Yes.
>
> Q: At that time you were aware of [Limited]'s financial situation, right?
>
> A: Yes.
>
> Q: And did you ask Mr. Ettayem during that conversation, well, where are you going to get this money to do the work that you are doing?
>
> A: I figured the contractor would do it, and then we would pay them for it.

> Q: And that is even though Mr. Ettayem had come to you and said that the contractor required 25 percent up front?
>
> A: I told them we paid on completed work. He said he would find another contractor.

(Tr. at 352-53.)[8]

{¶ 79} Sanders further testified that he did not know of any representation made to Ettayem with an intent to mislead Limited into entering the loan agreement. Given Sanders' testimony, we conclude that the manifest weight of the evidence supports a ruling in Huntington's favor on the fraud claim.

{¶ 80} Fourth, Limited argues that it provided competent, credible evidence establishing all elements of its conversion claim. We disagree.

{¶ 81} "Conversion is 'the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights.' " *Allan Nott Ents., Inc. v. Nicholas Starr Auto, L.L.C.*, 110 Ohio St.3d 112, 2006-Ohio-3819, ¶ 36, quoting *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). To establish a claim for conversion, a plaintiff must prove: (1) actual or constructive possession, or an immediate right to possession of the property; (2) a defendant's wrongful interference with the plaintiff's right to possession; and (3) damages. *Parmater v. Internet Brands, Inc.*, 10th Dist. No. 14AP-391, 2015-Ohio-253, ¶ 20.

{¶ 82} Here, Limited contends that Huntington wrongfully withheld from it the $139,861.82 in insurance proceeds paid in October 2009. To determine whether Huntington's action constituted conversion, we must identify whether Limited or Huntington had a right to possess the insurance proceeds. To do that, we turn to the language in the loan documents.

{¶ 83} Pursuant to the "Maintenance of Insurance" provision of the Allegheny Open-End Mortgage, Limited had the duty to "procure and maintain policies of fire insurance * * * with a standard mortgagee clause in favor of Lender." (Limited's Ex. 21.) The Agreement to Provide Insurance also obligated Limited to provide fire insurance for the Allegheny property that included a "[s]tandard [m]ortgagee's clause in favor of The

---

[8] This type of payment arrangement is common. Although John Schilling, Limited's contractor, requested a deposit from Limited, Schilling testified, "when [his company] did work on a lot of projects, actually, over the years, the banks would pay out money as you did the job." (Tr. at 626.)

Huntington National Bank, its successors and/or assigns * * *." (Limited's Ex. 25.) The Notice of Insurance Requirements, sent to Limited's insurer, detailed the insurance Huntington required on the Allegheny property, including a "[s]tandard [m]ortgagee's clause." (Limited's Ex. 26.) The Notice of Insurance Requirements requested that Limited's insurer provide evidence that Limited had obtained the necessary insurance. Finally, Limited's insurer provided a document entitled "Evidence of Property Insurance," which indicated that insurance had been issued covering the Allegheny property and listing Huntington as the mortgagee.

{¶ 84} A standard mortgage clause in a property insurance policy creates a separate contract between the insurer and the mortgagee, which makes the mortgagee an independent insured. *Pittsburgh Natl. Bank v. Motorists Mut. Ins. Co.*, 87 Ohio App.3d 82, 85 (9th Dist.1993); 4 Plitt, Maldonado, Rogers, & Plitt, *Couch on Insurance*, Section 65:36 (3d Ed.1997). Under such a mortgage clause, the mortgagee is entitled to the insurance proceeds to the extent that they are equal to the debt owed by the property owner under the mortgage, with any surplus belonging to the property owner. *State ex rel. Squire v. Royal Ins. Co.*, 58 Ohio App. 199, 202-03 (8th Dist.1938); *accord Std. Fire Ins. Co. v. Knowles*, 129 F.Supp.3d 1271, 1278 (N.D.Ala.2015) ("As to between the mortgagor/insured and the mortgagee, '[t]he mortgagee has the first right to the insurance proceeds to the extent of the amount owing it by the insured, not exceeding the total liability of the insurer under the policy; and the insured is entitled to the balance of the amount of such liability.' "); *In re Haas*, 71 B.R. 335, 340 (Bankr.N.D.Ohio 1987) (applying Ohio law, holding that under a standard mortgage clause, "the mortgagee has a prior right to the proceeds over the competing claim of the mortgagor"); *Jones v. Wesbanco Bank Parkersburg*, 194 W.Va. 381, 387 (1995) ("[U]nder a standard mortgage clause, the lender * * * named as a mortgagee is entitled to insurance proceeds to the extent that they are equal to the debt owed by the property owner * * *."); *Hoosier Plastics v. Westfield S. & L. Assn.*, 433 N.E.2d 24, 27 (Ind.App.1982) ("Where * * * the mortgage agreement requires that the insurance policy contain a standard mortgage clause * * * the mortgagee is generally entitled to the proceeds of the policy to the extent of his mortgage debt holding the surplus for the mortgagor's benefit."); *Grady v. Utica Mut. Ins. Co.*, 419 N.Y.S.2d 565, 569 (N.Y.App.1979) ("The effect of the standard mortgagee clause is simply to require that

payment of the loss be first made to the mortgagee up to the extent of his interest and that the balance be remitted to the mortgagor."). In other words, " '[t]he standard mortgage loss-payable clause gives the insurance proceeds to a mortgagee to the extent that they are equal to or less than the mortgage debt and accords priority to insuring the mortgage debt over the insured mortgagor's claim.' " *Brown v. Frankenmuth Mut. Ins. Co.*, 187 Mich.App. 375, 384 (1991). Mortgagees require the inclusion of standard mortgage clauses in order to indemnify themselves " 'against the diminution of the value of the security for [the] loan due to loss from certain perils and thereby to make certain that in the event of such a loss, the mortgagee would be protected up to the amount of [the] lien.' " *Jones* at 388, quoting *Citizens S. & L. Assn. v. Proprietors Ins. Co.*, 435 N.Y.S.2d 303, 306 (N.Y.App.1981).

{¶ 85} Because the mortgagee has a right to the insurance proceeds to the extent of the mortgage debt, the mortgagee "may decide whether the money is to be applied to the mortgage obligation or is to be used to repair the premises." *Squire* at syllabus; *accord Gen. G.M.C. Sales, Inc. v. Passarella*, 195 N.J.Super. 614, 625 (N.J.App.1984), *aff'd*, 101 N.J. 12 (1985) (holding that under a standard mortgage clause, "the mortgagee had the right to receive a portion of the insurance proceeds sufficient to satisfy the owners' debt. * * * [The property owners] did not have the right to use those proceeds to rebuild the damaged buildings."); *Hoosier Plastics* at 27 ("A mortgagee named in a [standard mortgage] loss payable clause will [ ] prevail over a mortgagor who wishes to use the proceeds for repair and restoration.").

{¶ 86} To confirm its authority to determine the disposition of any insurance proceeds, Huntington added the "Application of Proceeds" provision to the Allegheny Open-End Mortgage. That provision stated:

> Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. * * * If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's Interests may appear.

(Limited's Ex. 21.) Such a provision regarding the distribution of insurance proceeds is enforceable in favor of the mortgagee. *Jones v. GE Capital Mtge. Co.*, 179 B.R. 450, 456 (Bankr.E.D.Penn.1995) (holding that the mortgagee had no obligation to turn over

insurance proceeds to the property owner where the mortgage provided that "[t]he insurance proceeds, or any part [t]hereof may be applied by Mortgagee at its option either to the reduction of the indebtedness or to the restoration or repair of the property damaged").

{¶ 87} In the case at bar, Limited's mortgage debt exceeded $500,000 at the time of the fire. Huntington, therefore, was entitled to the $139,861.82 in insurance proceeds, which it applied to reduce Limited's indebtedness. As Huntington had a right to the insurance proceeds and to apply them to the mortgage indebtedness, Limited cannot show that Huntington wrongfully interfered with Limited's possession of the funds. Consequently, Limited cannot prevail on its conversion claim.

{¶ 88} In sum, we conclude that the trial court did not err in entering judgment in Huntington's favor on Huntington's action for foreclosure on the Allegheny mortgage or on Limited's claims. Accordingly, we overrule the fifth assignment of error.

{¶ 89} Finally, we return to Limited's first assignment of error, by which it argues that the trial court erred in adopting virtually verbatim the findings of fact and conclusions of law that Huntington proposed. We disagree.

{¶ 90} Pursuant to Civ.R. 52, when questions of fact are tried by a court without a jury, the court must provide written findings of fact and conclusions of law upon the request of any party. The rule permits a court to require the parties to submit proposed findings of fact and conclusions of law.

{¶ 91} This court, as well as others, have expressed concern over the wholesale adoption of one party's proposed findings of fact and conclusions of law. *State v. Stillman*, 5th Dist. No. 2005-CA-55, 2005-Ohio-6299, ¶ 26; *Kaechele v. Kaechele*, 72 Ohio App.3d 267, 276-77 (10th Dist.1991). Nevertheless, it is not per se error for a trial court to adopt, verbatim, a party's proposed findings of fact and conclusions of law. *Estie Invest. Co. v. Braff*, 11th Dist. No. 2017-L-172, 2018-Ohio-4378, ¶ 22; *Mulchin v. ZZZ Anesthesia, Inc.*, 6th Dist. No. E-05-045, 2006-Ohio-5773, ¶ 20. Before doing so, a trial court must thoroughly review the document to ensure that it is accurate in fact and law. *Watts v. Fledderman*, 1st Dist. No. C-170255, 2018-Ohio-2732, ¶ 22; *Bluford v. Wells Fargo Fin. Ohio 1, Inc.*, 176 Ohio App.3d 500, 2008-Ohio-686, ¶ 16 (8th Dist.); *An v. Manson*, 10th Dist. No. 06AP-90, 2006-Ohio-6733, ¶ 15. If the proposed findings of fact and conclusions

of law are supported in the record and law, then the trial court does not err by adopting them. *Watts* at ¶ 22; *Gottlieb v. Gottlieb*, 10th Dist. No. 90AP-1131 (Mar. 19, 1991).

{¶ 92} In the case at bar, Limited criticizes the trial court for not making a number of findings of fact. However, the findings Limited faults the trial court for omitting are either irrelevant or not supported by the manifest weight of the evidence. A review of the entirety of the trial court's findings shows that the court accurately recounted the evidence, although it relied on evidence and drew inferences that Limited disputes. We cannot fault the trial court for finding Huntington's version of events more credible and convincing than Limited's version. Accordingly, we conclude that the trial court did not err in adopting Huntington's proposed findings of fact and conclusions of law, and we overrule the first assignment of error.

{¶ 93} For the foregoing reasons, we overrule Limited's five assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

———————————