[Cite as *O'Driscoll v. Paoloni*, 2016-Ohio-8520.]

**IN THE COURT OF APPEALS**

**ELEVENTH APPELLATE DISTRICT**

**PORTAGE COUNTY, OHIO**

| | | |
|---|---|---|
| SEAN O'DRISCOLL, | : | **O P I N I O N** |
| Plaintiff-Appellant, | : | |
| - vs - | : | **CASE NO. 2016-P-0031** |
| ROBERT JOSEPH PAOLONI, ESQ., et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

Civil Appeal from the Portage County Court of Common Pleas, Case No. 2011 CV 854.

Judgment: Affirmed.

*Christopher R. Fortunato,* 13363 Madison Avenue, Lakewood, OH 44107 (For Plaintiff-Appellant).

*Kurt R. Weitendorf* and *Todd A. Mazzola,* Roderick Linton Belfance, LLP, 50 South Main Street, 10th Floor, Akron, OH 44308-1828 (For Defendants-Appellees).


CYNTHIA WESTCOTT RICE, P.J.

{¶1} Appellant, Sean O'Driscoll, appeals from the Portage County Court of Common Pleas entry of summary judgment on his claim for legal malpractice against appellees, Robert J. Paoloni, Esq., et al. At issue is whether appellant filed his cause of action within the one-year limitation period set forth under R.C. 2305.11. We affirm the judgment of the trial court.

**{¶2}** In August 2006, appellee filed a complaint for divorce on appellant's behalf. The matter was ultimately tried before a magistrate, who issued his decision on May 2, 2008. The parties discussed filing objections. Appellee maintained filing objections would delay entry of final judgment which, in appellee's view, would redound to appellant's detriment. To wit, the magistrate's decision reduced the amount appellant was paying in expenses and support from $1,700 per month to $600 per month. According to appellant, he wanted objections to be filed because there were various issues, including problems with the distribution of assets, problems with the allocation of marital debt, as well as errors relating to other financial matters, that, in his view, the decision failed to adequately address.

**{¶3}** Appellee did not file objections within the time allotted under Civ.R. 53; on July 11, 2008, however, appellee filed a motion for clarification on three issues: the calculation of appellant's accumulated sick leave; a claimed miscalculation regarding the equalization of assets; and the lack of a jointly-filed tax return for 2007. A hearing on the motion was held on July 28, 2008, after which the trial court denied the motion. Appellant did not contact or otherwise speak with appellee following this hearing. The final divorce decree was entered on August 4, 2008. Appellee formally withdrew from the case on June 11, 2009. Notwithstanding the lack of contact, appellant insisted appellee remained "on the clock" as his attorney until the withdrawal.

**{¶4}** On May 18, 2010, appellant commenced an action for legal malpractice. The matter was subsequently dismissed, but re-filed on July 11, 2011. Appellee filed his answer, asserting various affirmative defenses, including an allegation that appellant's complaint was filed outside the applicable statute of limitations.

{¶5} On December 4, 2015, appellee filed a motion for summary judgment, arguing appellant failed to file his complaint within one-year of the accrual of his claim. Appellee emphasized that he was not involved in any additional work relating to appellant's case after the July 28, 2008 hearing. Appellee also pointed out appellant had been consulting attorneys from Buckingham, Doolittle, and Burroughs ("BDB") since the magistrate's entry was filed in May 2008. Appellee attached various documents, including e-mails and letters exchanged between appellant and attorneys at BDB, to the motion to illustrate appellant had effectively terminated his relationship with appellee well before his formal withdrawal in June 2009.

{¶6} Specifically, in a July 23, 2008 letter to BDB attorney, Peter Cahoon, Esq., appellant stated he discussed the May 2, 2008 magistrate's decision with appellee on May 12, 2008 for "almost 45 minutes." In the document, appellant concedes appellee asked him if he wanted to file objections to the decision. Regarding this question, appellant noted "[t]he first thought that went through my head was that there was **no** way I was going to pay him another dime, and I would never file objections with him as my attorney." (Emphasis sic.)

{¶7} In a July 25, 2008 memorandum, a BDB staff member advises Attorney Cahoon that appellant had "stopped into the office" and provided BDB "with a notice in regard to a hearing scheduled on Monday, July 28[, 2008] * * * for the motions filed in July, which are also attached for your review. One of the motions was filed by [appellant's] prior attorney. [Appellant] wants to know if he should have his prior attorney attend, or if he could officially change attorneys and have you * * * attend."

3

{¶8} Further, in an April 28, 2009 e-mail to BDB attorney Marietta Pavlidis, Esq., appellant notes that, after the July 28, 2008 hearing, he "walked away from [appellee] and never heard from him again, in any capacity. I never said, "You're fired!", I just walked out. It was obvious to both of us I wanted nothing to do with the man again. My divorce was final and I was rid of him." Later in the letter, appellant stated he needed appellee out of his life, emphasizing "I don't want any correspondence from him, ever." Appellant further requested Attorney Pavlidis' assistance in, what he viewed, would be a foreseeable legal problem relating to distribution of his pension under the trial court's division of property order ("DOPO").

{¶9} In his memorandum in opposition, appellant argued appellee was still his attorney until the date of his withdrawal, June 11, 2009. He also attached various e-mails between appellee and an associate who was also apparently involved with appellant's case, Anna Parise, which, he maintained, demonstrated appellant continued, albeit passively, to represent him into the Spring of 2009.

{¶10} In particular, on April 13, 2009, Ms. Parise sent appellee an e-mail advising him that, per the final divorce order, a QDRO must be prepared which must be signed by appellant. That same day, appellee e-mailed his assistant directing her to send Ms. Parise's message and other relevant documentation to appellant. Appellee also asked that appellant confirm he received the communication. On April 20, 2009, appellee e-mailed his assistant, stating he had called appellant regarding the QDRO issue and asked him to confirm he received the information. Appellee noted "[w]e have heard nothing from him."

{¶11} On April 30, 2009, appellee e-mailed Ms. Parise explaining he sent appellant the information relating to the QDRO on April 13 and called him. Appellee stated "[h]e has not acknowledged either of the attempts to contact him. The email did not come back as unclaimed/bad address." In a subsequent April 30 e-mail to Ms. Parise, appellee reiterated that, despite many efforts to contact appellant, he had been unable to do so. Later, on June 8, 2009, Ms. Parise sent appellee an e-mail relating to the trial court's DOPO for the division of appellant's STRS benefits. Ms. Parise requested appellee to execute the DOPO and return it to her. On the same date, appellee e-mailed his assistant asking whether he "put an entry on withdrawing as atty?" His assistant noted she would prepare the entry. Appellant subsequently withdrew as counsel.

{¶12} In addition to the above communications, appellant asserted that, even though he engaged BDB attorneys, they were being used for matters outside the scope of the case for which he had retained appellant. He maintained BDB attorneys were not working on any remaining issues associated with the divorce case; instead, they were looking into custody issues related to his son Dane. Based upon the foregoing, appellant maintained there were genuine issues of material fact as to whether appellee was his attorney within a year of the filing date, i.e., May 18, 2010.

{¶13} After considering the parties' respective positions, the trial court concluded the attorney-client relationship terminated on April 28, 2009, more than one-year prior to appellant filing his initial complaint and more than one-year after appellant became aware of his potential cause of action. The court underscored that the April 28, 2009 e-mail from appellant to BDB attorneys was captioned "non Dane issue" and sought BDB

5

attorneys to represent him in the context of any issues that arose with respect to the DOPO and potential problems surrounding his STRS account. The court therefore determined appellant's cause of action was barred by the applicable statute of limitations and appellee was entitled to judgment as a matter of law. Appellant appeals and assigns the following error:

{¶14} "The trial court erred when it granted summary judgment in favor of the appellee when it found the cognizable event commencing the statute of limitations to run on April 28, 2009."

{¶15} Summary judgment is a procedural tool that terminates litigation and thus should be entered with caution. *Davis v. Loopco Industries, Inc.*, 66 Ohio St.3d 64, 66 (1993). Summary judgment is proper where (1) there is no genuine issue of material fact remaining to be litigated; (2) the movant is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and, viewing the evidence in the non-moving party's favor, that conclusion favors the movant. *See, e.g.*, Civ.R. 56(C).

{¶16} When evaluating a motion for summary judgment, the trial court may not weigh the evidence or select among reasonable inferences. *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121 (1980). Instead, all questions must be resolved in the non-moving party's favor. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 359 (1992). Hence, a trial court must overrule a motion for summary judgment where conflicting evidence exists and alternative reasonable inferences can be drawn. *Pierson v. Norfork Southern Corp.*, 11th Dist. Ashtabula No. 2002-A-0061, 2003-Ohio-6682, ¶36. In short, the central issue on summary judgment is, "whether the evidence presents sufficient disagreement

6

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). An appellate court reviews a trial court's entry of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

{¶17} Though this suit involves an action for legal malpractice, the central issue for the trial court and on review is whether appellant's claims are barred by the statute of limitations. For legal malpractice, R.C. 2305.11 provides that the statute of limitations is one year after the cause of action accrued.

> {¶18} An action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later. *Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, ¶4, 846 N.E.2d 509 quoting *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St.3d 54 (1989), syllabus.

{¶19} Generally, "[a]n attorney-client relationship can terminate upon the affirmative act of either party." *Savage v. Kucharski*, 11th Dist. Lake No. 2005-L-141, 2006-Ohio-5165, ¶23; *see also Trickett v. Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A.*, 11th Dist. Portage No. 2000-P-0105, 2001 Ohio App. LEXIS 4806, *7 (Oct. 26, 2001). To determine whether an attorney-client relationship has ended, "'courts look for a discrete act (or acts) by either party that signals the severing of their relationship.'" *Cotterman v. Arnebeck*, 10th Dist. Franklin No. 11AP-687, 2012-Ohio-4302, ¶16, quoting *Woodrow v. Heintschel*, 194 Ohio App.3d 391, 2011-Ohio-1840, ¶43 (6th Dist.); *see also Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, ¶9. ("[T]he date of termination of the attorney-client relationship * * * is to be determined by considering the

7

actions of the parties.") Such acts include one party sending the other a letter stating that the attorney-client relationship is over, as well as the client's retention of another attorney for representation in the same matter for which the client had retained previous counsel. *Nichter v. Shamansky*, 10th Dist. Franklin No. 14AP-811, 2015-Ohio-1970, ¶19-20; *see also Savage, supra.* "'[T]he termination of the attorney-client relationship depends, not on a subjective loss of confidence on the part of the client, but on conduct, an affirmative act by either the attorney or the client that signals the end of the relationship.'" (Emphasis omitted.) *Duvall v. Manning*, 11th Dist. Lake No. 2010-L-069, 2011-Ohio-2587, ¶27, quoting *Mastran v. Marks*, 9th Dist. Summit No. 14270, 1990 Ohio App. LEXIS 1219 (Mar. 28, 1990).

**{¶20}** The question of when an attorney-client relationship terminates is generally a question of fact. *Duvall, supra.* A court, however, may decide the question as a matter of law if either party has undertaken affirmative actions that are patently inconsistent with the continued attorney-client relationship. *Id.* "For a trial court to grant summary judgment on the grounds that an act of either party has terminated the attorney-client relationship, the 'act must be clear and unambiguous, so that reasonable minds can come to but one conclusion from it.'" *Id.*, quoting *Mastran, supra.*

**{¶21}** In this case, we conclude the trial court properly entered summary judgment because the content of the April 28, 2009 e-mail to Attorney Pavlidis unequivocally demonstrates he wished BDB attorneys to handle the remaining issues surrounding the underlying divorce.

**{¶22}** The representations in this e-mail demonstrate appellant did not desire to use appellee as his attorney to litigate certain legal issues he anticipated vis-à-vis the

8

DOPO and the division of his STRS, i.e., outstanding issues associated with the divorce action. Appellant not only makes it clear that he was dissatisfied with appellee's representation, e.g., his failure to file objections (even though he had stated in a previous letter that he "would never file objections with him as my attorney"), he also notes he did not return a voicemail from appellee's office regarding the DOPO and the pending STRS issues. Instead, appellant states he independently contacted STRS representatives. Appellant proceeds to detail the information he received from STRS and then emphasizes his need to remove appellee from his life. Appellant queries whether he should have all future court papers sent directly to his address or directed to Attorney Pavlidis. He concludes his e-mail by advising he wanted to let Attorney Pavlidis know about his pension because an issue "may be coming up." And if it does, "how can we make sure the court's division of property order that ends up in Columbus is favorable for me?"

{¶23} Despite appellant's testimony and representations that he was using BDB only for issues relating to his son Dane, the April 28, 2009 e-mail, captioned "non Dane issue," demonstrates he intended to retain Attorney Pavlidis to represent him with any future issue that might arise relating to his retirement and the finalization of the DOPO. This is an affirmative action that is patently inconsistent with the attorney-client relationship between appellant and appellee. This, coupled with the statements regarding appellant's irritation and dissatisfaction with appellee's representation, was sufficient to terminate appellant's relationship with appellee.

{¶24} Appellant's assignment of error lacks merit.

9

{¶25} For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J.,

THOMAS R. WRIGHT, J.,

concur.