[Cite as *Starner v. Onda*, 2023-Ohio-1955.]

IN THE COURT OF APPEALS OF OHIO

TENNTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jeffrey Starner et al., | : | |
| Plaintiffs-Appellants, | : | No. 22AP-599 |
| | | (C.P.C. No. 19CV-4489) |
| v. | : | |
| | | (ACCELERATED CALENDAR) |
| Robert J. Onda et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on June 13, 2023

**On brief:** *Thomas C. Loepp, Law Offices, Co., LPA*, and *Thomas C. Loepp*, for appellants. **Argued**: *Thomas C. Loepp*.

**On brief:** *Gallagher Sharp LLP, Theresa A. Richthammer, Richard C.O. Rezie*, and *Taylor M. Iacobacci*, for appellees. **Argued**: *Taylor M. Iacobacci*.

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Plaintiffs-appellants Jeffrey Starner, Merchants 5 Star, Inc., and Merchants 5 Star, Ltd., appeal from a judgment of the Franklin County Court of Common Pleas that granted summary judgment to defendants-appellees Robert J. Onda, Brian K. Kim, Timothy S. Rankin, and Onda, LaBuhn, Rankin, & Boggs Co., LPA ("OLRB"). For the following reasons, we reverse that judgment and remand this case to the trial court for further proceedings.

## I. Facts and Procedural History

{¶ 2} Merchants 5 Star, Ltd. was a trucking company based in Marietta, Ohio. Merchants 5 Star, Inc. owned a fleet of semi-tractors and trailers ("rolling stock"), which Merchants 5 Star, Ltd. leased and used to operate. In 2014, Starner owned all the

membership interests of Merchants 5 Star, Ltd. and all the issued and outstanding stock of Merchants 5 Star, Inc. Starner also ran the trucking business.

{¶ 3} In spring 2014, Starner began seriously exploring selling Merchants 5 Star, Ltd. and Merchants 5 Star, Inc. (the "M5S entities") to an investment group led by Jim Pack (the "Pack Investors"). The negotiations culminated in a letter of intent in which the investors agreed to: (1) assume the liabilities of the M5S entities; (2) infuse cash into the companies, "probably in the $350K to $500[K] range"; (3) pay Starner for his interests in the M5S entities with a $400,000 note, which would not accrue interest for 6 months and would be secured with Merchant 5 Star, Inc. stock and Merchant 5 Star, Ltd. membership interest; and (4) continue to employ Starner for at least 3 years. (Defs.' Ex. 25.) Importantly, "[t]he key element" of the deal was "to make sure [the M5S entities'] debts [were] resolved." (Defs.' Ex. 25.)

{¶ 4} Pack's attorney drafted a purchase agreement using the terms in the letter of intent, and forwarded the draft agreement to Starner. At that point, Starner hired Onda to represent him and the M5S entities in the sale of Starner's interests in the M5S entities.[1] Starner gave Onda the letter of intent and the draft purchase agreement. Starner asked Onda "to put together a deal that was within this framework that provided every protection possible [for him and the M5S entities]." (Starner Depo. at 164; *see also* Starner Aff. at ¶ 10 ("I asked Onda to build in every possible protection to protect me and my companies.").)

{¶ 5} Onda revised the draft purchase agreement and forwarded the revised agreement to Pack. The Pack Investors accepted the revised agreement. Starner signed the purchase agreement selling his interests in the M5S entities on July 18, 2014. As part of the sale, Merchants Holding, LLC, the company formed to purchase the M5S entities, executed a cognovit note promising to pay Starner $400,000. Merchants Holding also executed a security agreement, pledging as security for the note Merchants Holding's membership interest in Merchants 5 Star, Ltd. and the stock of Merchants 5 Star, Inc.

---

[1] Onda maintains that he represented Starner individually with respect to the sale, and did not represent the M5S entities during the sale transaction. In this appeal, we review a judgment granting summary judgment to defendants. When determining whether summary judgment is appropriate, a court construes the evidence most strongly in favor of the non-moving party. *Bliss v. Manville*, __ Ohio St.3d __, 2022-Ohio-4366, ¶ 13. Consequently, we construe conflicts in the evidence in favor of Starner, the non-moving party.

{¶ 6}   Soon after the sale, Starner noticed that Pack was not paying the M5S entities' monthly obligations.  Pack also changed the computer system, which prevented Starner from accessing financial and business information.  Starner eventually discovered that Pack had sold much of the unencumbered rolling stock, but had not used the sale proceeds to meet Merchants Holding's obligations under the purchase agreement.

{¶ 7}   Starner sought assistance from Onda in dealing with Merchants Holding's failure to comply with the terms of the purchase agreement.  On March 10, 2015, Onda sent Pack a letter providing notice of an event of default under the cognovit promissory note. The letter stated that Merchants Holding had defaulted because it failed to make payments under the note to Starner, pay the M5S entities' debts, and contribute working capital as required in the purchase agreement.

{¶ 8}   In May or June 2015, Starner started losing confidence in Onda.  Starner began thinking that his problems may have originated with Onda because "none of the provisions in [the letter of intent] that were critical to the success of it were being followed [and] [t]here seemed to be no way to make them happen."  (Starner Depo. at 225.)

{¶ 9}   Around that time, Onda had suggested that Starner might want to exercise his right under the security agreement to reclaim the membership interest in Merchants 5 Star, Ltd. and the stock in Merchants 5 Star, Inc.  Given that the M5S entities' liabilities greatly exceeded their assets, Onda recommended that upon retaking ownership, Starner immediately place the M5S entities into a receivership.  Starner explained that "at that point[,] I went to another attorney because I became so concerned that [Onda] had responsibility in this thing."  (Starner Depo. at 226.)

{¶ 10} According to Starner, he hired attorney Danny Caudill on June 16, 2015 to represent him in an action against Merchants Holding on the cognovit promissory note. Starner explained that "[i]nitially, both [Caudill and Onda] were involved" in advising him. (Starner Depo. at 241.)  "But," Starner further clarified, "[Onda] knew that I had retained [Caudill] and that everything was turning over to [Caudill]."  (Starner Depo. at 242.) Although Starner was unsure of the exact date the turnover occurred, he believed it happened in mid-June 2015.

{¶ 11} However, Starner's memory is inconsistent with Onda's recall of the transition between the two attorneys.  According to Onda, Caudill did not take over as

Starner's counsel until late July 2015. Onda confirmed that, as of July 10, 2015, he and Caudill were still concurrently representing Starner.

{¶ 12} On July 20, 2015, Starner exercised his security interest in the M5S entities and took back from Merchants Holding its interests in the M5S entities. Two days later, the M5S entities filed a receivership action. Starner engaged Rankin, an OLRB attorney, to file that action and act as the M5S entities' attorney in the receivership action. In an order dated July 28, 2015, the trial court appointed a receiver to wind down the M5S entities, and to liquidate the assets of the M5S entities and distribute the proceeds to their creditors.

{¶ 13} While the receivership was pending, on September 6, 2016, Starner and the M5S entities filed suit against defendants for legal malpractice arising out of Starner's sale of his interests in the M5S entities to Merchants Holding. Starner—not the receiver—filed the legal malpractice action on behalf of the M5S entities. The receiver determined it was not in the M5S entities' best interests to litigate the legal malpractice action. The receiver moved the trial court for the authority to sell and assign the M5S entities' interests in any legal malpractice claims against defendants. The trial court granted the motion. On February 28, 2017, the receiver conducted an auction, which Starner won. Starner thus acquired an assignment of "any [and] all right, title, and interest of [the M5S entities] in the Malpractice Claims." (Defs.' Ex. A, Aug. 13, 2021 Mot. for Summ. Jgmt.)

{¶ 14} Starner moved to amend the complaint in the legal malpractice action to add the allegation that he had purchased from the receiver all right, title, and interest in and to the legal malpractice claims the M5S entities had against defendants. The trial court denied Starner's motion. On June 7, 2018, plaintiffs voluntarily dismissed their legal malpractice action against defendants pursuant to Civ.R. 41(A).

{¶ 15} On March 20, 2019, after receiving a report from the receiver that he had completed a liquidation and distribution of all the assets of the receivership estate, the trial court issued an order terminating the receivership. The March 20, 2019 order also judicially dissolved the M5S entities.[2]

---

[2] The parties did not include in the record of this case court filings from the receivership action or the original legal malpractice action. However, appellate courts may take judicial notice of publicly accessible online records. *Teays Valley Local School Dist. Bd. of Edn. v. Struckman*, 4th Dist. No. 21CA7, 2023-Ohio-244, ¶ 76; *Ltd. Invest. Group Corp. v. Huntington Natl. Bank*, 10th Dist. No. 21AP-61, 2022-Ohio-3657, ¶ 46; *Fipps v. Day*, 8th Dist. No. 111633, 2022-Ohio-3434, ¶ 2, fn. 1. The court filings we need to fully elucidate the facts are publicly available on the internet, so we take judicial notice of them.

{¶ 16} On June 3, 2019, plaintiffs brought the instant legal malpractice action. Before defendants could respond to the complaint, plaintiffs filed an amended complaint.

{¶ 17} Defendants filed two motions for summary judgment. In their first motion, defendants argued they were entitled to judgment as a matter of law on Starner's legal malpractice claim because Starner failed to file his claim within the statute of limitations. In their second motion, defendants argued they were entitled to judgment as a matter of law on the M5S entities' legal malpractice claims because Starner lacked standing to assert those claims on behalf of the M5S entities. On September 6, 2022, the trial court issued a judgment granting both motions for summary judgment.

## II. Assignment of Error

{¶ 18} Starner and the M5S entities now appeal the September 6, 2022 judgment, and they assign the following error:

> The trial court erred in granting summary judgment to the Defendants on Plaintiffs' claims for legal malpractice.

## III. Analysis

{¶ 19} A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the non-moving party, and that conclusion is adverse to the non-moving party. *A.J.R. v. Lute*, 163 Ohio St.3d 172, 2020-Ohio-5168, ¶ 15; *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, ¶ 18. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *A.J.R.* at ¶ 15. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 20} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that

there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Dresher* at 293.

{¶ 21} We will first address Starner's argument that the trial court erred in granting summary judgment on his legal malpractice claim. Starner contends that questions of fact remain regarding whether he timely asserted his claim and, thus, the trial court should not have found as a matter of law that the statute of limitations barred his suit. We agree.

{¶ 22} Claims for legal malpractice "against an attorney or a law firm or legal professional association * * * shall be commenced within one year after the cause of action accrued." R.C. 2305.11(A). The application of R.C. 2305.11(A) in this case is complicated by Starner's reliance on the savings statute, R.C. 2305.19. In relevant part, the savings statute provides: "In any action that is commenced or attempted to be commenced, if in due time * * * the plaintiff fails otherwise than upon the merits, the plaintiff * * * may commence a new action within one year after the date of * * * the plaintiff's failure otherwise than upon the merits or within the period of the original applicable statute of limitations, whichever occurs later." R.C. 2305.19(A). " 'A voluntary dismissal pursuant to Civ.R. 41(A) constitutes a failure otherwise than upon the merits within the meaning of the savings statute, R.C. 2305.19.' " *Vitantonio, Inc. v. Baxter*, 116 Ohio St.3d 195, 2007-Ohio-6052, ¶ 4, quoting *Frysinger v. Leech*, 32 Ohio St.3d 38 (1987), paragraph two of the syllabus.

{¶ 23} Here, Starner originally filed his legal malpractice claim against defendants on September 6, 2016, and he voluntarily dismissed that claim pursuant to Civ.R. 41(A) on June 7, 2018. Starner then refiled his legal malpractice claim in the instant action on June 3, 2019. Thus, Starner recommenced his legal malpractice claim within one year of the failure of the original claim for a reason unrelated to the merits of the claim.

{¶ 24} Nevertheless, for the savings statute to apply, Starner must clear one additional hurdle. " 'The Ohio saving clause cannot save an action from the running of the statute of limitation unless the original action was commenced or attempted to be commenced within the applicable period of limitation.' " *Portee v. Cleveland Clinic Found.*, 155 Ohio St.3d 1, 2018-Ohio-3263, ¶ 11, quoting *Howard v. Allen*, 30 Ohio St.2d 130, 133-34 (1972). Thus, we must determine whether Starner met the one-year statute of limitations

applicable to legal malpractice claims when he filed his original action against defendants on September 6, 2016.

{¶ 25} "[A]n action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later." *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St.3d 54 (1989), syllabus, applying *Omni-Food & Fashion, Inc. v. Smith*, 38 Ohio St.3d 385 (1988). This test requires two factual determinations: (1) when the client knew or should have known that he may have an injury caused by his attorney; and (2) when the attorney-client relationship terminated. *Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, ¶ 4. The statute of limitations starts running on the latter of the two dates. *Id.*

{¶ 26} A cognizable event is an occurrence that alerts or should alert a client " 'that [a] questionable legal practice may have occurred.' " *Fisk v. Rauser & Assocs. Legal Clinic Co., L.L.C.*, 10th Dist. No. 10AP-427, 2011-Ohio-5465, ¶ 23, quoting *Zimmie* at 58; *accord Harris v. Reedus*, 10th Dist. No. 15AP-181, 2015-Ohio-4962, ¶ 15 (a "cognizable event" is an event that "does or should alert a reasonable person that a questionable legal practice may have occurred"); *Virginia Homes, Ltd. v. Goldman*, 10th Dist. No. 13AP-1012, 2014-Ohio-1750, ¶ 21 (same). The inquiry into whether a cognizable event has occurred focuses on the point of discovery, i.e., the point at which the client realized or should have realized he was injured by his attorney's actions or omissions. *Smith v. Barclay*, 10th Dist. No. 11AP-798, 2012-Ohio-5086, ¶ 24. However, the client need not be aware of the full extent of his injuries before the cognizable event triggers the statute of limitations. *Harris* at ¶ 15; *Goldman* at ¶ 21; *Fisk* at ¶ 23. Knowledge of a potential problem starts the statute to run, even when the client does not know all the details. *Barclay* at ¶ 25. The cognizable event puts the client on notice to investigate the facts and circumstances relevant to his legal malpractice claim, and the plaintiff does not need to have discovered all the facts necessary to file the claim for the statute of limitations to begin running. *Harris* at ¶ 15; *Goldman* at ¶ 21.

{¶ 27} In his deposition, Starner was asked about when he suspected that Onda may have provided subpar legal services:

Q: When did you start to suspect that [Onda] may have screwed up in writing that agreement?

A: To tell you the truth, I maintained my confidence in Bob Onda until probably May or June of 2015. And at that point I started really realizing what happened to me.

Q: And why - - what made you start to think that the problem may have been with [Onda] at that point?

A: Several things. A, none of the provisions in that letter [of intent] that were critical to the success of it were being followed. There seemed to be no way to make them happen. I had determined that Jim Pack was a liar at that point and said a lot of false things * * *.

And there was a meeting * * *. * * * And there were some very pointed questions asked. Like Bob Onda asked [investor] Ben MacDowell, did you have the down payment money when you made this deal? And Ben MacDowell very sheepishly said, no, he did not.

And that's the first time I heard the word "fraud." [Onda] said, well, that's fraud, Ben.

So not to extend this out, but from that point on I started questioning what's going on here? And then particularly when [Onda] urged me that the best solution was receivership, that was the only way. Because there were unknown accounts payable. They were in the vicinity of $2 million, an unbelievable amount.

And that's when [Onda] directed me towards Matt Fisher and his firm as receiver. And shortly after that, I had a choice to make as to how I was going to pursue things. And I chose to hire another attorney because I became concerned - - [Onda] wanted me to keep his firm and have Tim Rankin do this and do that.

And at that point I went to another attorney because I became so concerned that [Onda] had responsibility in this thing * * *.

(Starner Depo. at 224-26.)

{¶ 28} This testimony reflects that, in May or June 2015, Starner began to believe that Onda had not adequately protected his interests in the purchase agreement, which resulted in injury to him when Merchants Holding breached that agreement. According to

his testimony, after receiving advice from Onda to place the M5S entities into a receivership, Starner hired another attorney because he thought Onda "had responsibility" for the losses associated with the breach of the purchase agreement. (Starner Depo. at 226.) Starner hired Caudill on June 16, 2015. The evidence, therefore, establishes that Starner understood as of June 16, 2015, at the latest, that a questionable legal practice may have occurred that caused him injury. Consequently, we determine that reasonable minds could only conclude that a cognizable event occurred, at the latest, on June 16, 2015—more than one year before Starner filed his original complaint on September 6, 2016.

{¶ 29} In contesting this conclusion, Starner points out that in October 2015, Onda discussed with the receiver contesting liens a M5S creditor had filed against M5S assets. Starner, however, does not explain how this conversation has any relevance as to when a cognizable event occurred. The October 2015 conversation simply does not pertain to the question of when Starner became aware that Onda's actions may have injured him.

{¶ 30} Starner also points out that he did not learn until 2016 that the receiver decided not to take any action to recover M5S assets, i.e., the rolling stock, that Pack allegedly wrongly sold.[3] Again, Starner fails to clarify how the receiver's decision has any bearing on when he first knew that a questionable legal practice may have occurred that caused him injury. Conceivably, the receiver's decision to forego steps to recover the contested assets may have harmed Starner. The receiver's decision potentially decreased the size of the receivership estate and, thus, the amount distributable to the M5S entities' creditors. Starner had personally guaranteed loans for the M5S entities, so the amount he had to pay M5S creditors to settle the debts he guaranteed theoretically increased when the asset pool decreased. But, as we stated above, a client need not be aware of the full extent of his injuries before a cognizable event triggers the statute of limitations. *Harris*, 2015-Ohio-4962, at ¶ 15; *Goldman*, 2014-Ohio-1750, at ¶ 21; *Fisk*, 2011-Ohio-5465, at ¶ 23.

{¶ 31} We next turn to the second part of the statute of limitations test for legal malpractice: determining the date on which the attorney-client relationship terminated.

---

[3] Starner argues that Onda deviated from the standard of care by not insisting that Merchants Holding use the M5S entities' unencumbered assets, specifically the rolling stock, as security for Merchants Holding's obligation to pay the promissory note. According to Starner, had such a security interest existed, he could have blocked Pack from selling the rolling stock. Thus, Starner theorizes, he suffered damages caused by Onda's alleged malpractice when the receiver refused to "claw back" M5S rolling stock that Pack supposedly wrongly sold to third parties.

Generally, the attorney-client relationship is consensual and, thus, subject to termination by the acts of either party. *Felix v. Gerth Law Office, L.L.C.*, 10th Dist. No. 17AP-533, 2018-Ohio-3133, ¶ 13; *Nichter v. Shamansky*, 10th Dist. No. 14AP-811, 2015-Ohio-1970, ¶ 12. To determine whether an attorney-client relationship has ended, courts look for an act by either party that signals the severing of the relationship. *Felix* at ¶ 13; *accord O'Driscoll v. Paoloni*, 11th Dist. No. 2016-P-0031, 2016-Ohio-8520, ¶ 19 (holding that the termination of the attorney-client relationship depends not on a subjective loss of confidence, but on an affirmative act by either party signaling the end of the relationship). Such acts include the client's retention of another attorney to represent the client in the same matter for which the client retained the previous counsel. *Felix* at ¶ 13; *Goldman* at ¶ 33. Notably, an explicit statement terminating the attorney-client relationship is not necessary. *Nichter* at ¶ 12; *Goldman* at ¶ 31.

{¶ 32} The date on which an attorney-client relationship terminates is a question of fact. *Conley*, 2006-Ohio-2035, at ¶ 9. However, a court may decide that question as a matter of law if either party has undertaken affirmative actions that are patently inconsistent with a continued attorney-client relationship. *Axline v. Kevin R. Conners, L.L.C.*, 10th Dist. No. 14AP-924, 2015-Ohio-4679, ¶ 15; *Nichter* at ¶ 10; *Goldman* at ¶ 30. "Where the evidence is clear and unambiguous as to when the attorney-client relationship terminates for a particular transaction so that reasonable minds can come to but one conclusion from that evidence," no question of fact remains to prevent a court from deciding the matter on summary judgment. *Goldman* at ¶ 30.

{¶ 33} As we stated above, Starner testified during his deposition that he hired another attorney, Caudill, "because [he] became so concerned that [Onda] had responsibility in this thing." (Starner Depo. at 226.) Starner discussed Caudill again later in his deposition:

> Q: What was Danny Caudill's involvement?
>
> A: I mentioned earlier at some point I decided to retain another attorney because I was becoming suspect of what had occurred and what happened to me. And I had retained Danny Caudill as opposed to retaining [Onda's] firm to represent me at that point.
>
> Q: At this point you suspected that [Onda] may have done something wrong?

A: Yes.

Q: At what point did Danny Caudill take over for [Onda's] firm?

A: Initially, both firms were involved.

* * * Tim Rankin represented us in filing the receivership in court down here. But [Onda] knew that I had retained [Caudill] and everything was turning over to [Caudill].

Q: Everything was turning over to [Caudill] around this time when [Caudill] [was] cc'd on these [June 15, 2015] e-mails, correct?

A: Yes. I'm not sure exactly, but it was mid-June, yes.

Q: Okay. And you mention that Tim Rankin was dealing with the receivership, correct?

A: Tim Rankin represented the [M5S] companies in the Franklin County Courthouse filing for [the] receivership. That was his role.

(Starner Depo. at 241-42.)

{¶ 34} Later, when discussing an e-mail sent July 23, 2015, counsel asked Starner: "At this point [Caudill] had replaced [Onda], correct?" Starner answered, "[y]es, that is correct." (Starner Depo. at 245.)

{¶ 35} In sum, therefore, Starner stated in his deposition that he hired Caudill "as opposed" to Onda, and "everything was turning over" to Caudill. (Starner Depo. at 241-42.) Hiring Caudill, however, did not sever Starner's connection with OLRB. Upon reassuming ownership of the M5S entities, Starner hired Tim Rankin, an OLRB attorney, to represent the M5S entities in the receivership action.

{¶ 36} In an affidavit authored after his deposition, Starner offered a different recollection regarding the course of his relationship with Onda. Starner stated:

Even though [he] began to question whether Onda made mistakes negotiating the [purchase] [a]greement, [he] continued to consult and receive advice from Onda throughout the remainder of 2015, and even into the year 2016, with regard to [his] rights and remedies against the Pack Investors [i.e., Pack and the individuals who invested with Pack to purchase the M5S entities]. [He] did not terminate [his] attorney-client relationship with Onda and [Onda] did not inform [Starner]

that he was terminating [the] attorney-client relationship. For the remainder of the year 2015, Caudill and Onda collaborated on [Starner's] behalf with regard to clawing the assets of the [M5S entities] back in the receivership and pursuing claims against the Pack Investors for breach of contract and fraud.

(Pls.' Ex. 2; Starner Aff. at ¶ 19.)

{¶ 37} Onda set forth his own rendition of the facts. In his affidavit, Onda testified that he became aware by June 2015 that Starner hired Caudill to replace him as Starner's personal counsel, and Onda began transitioning the representation to Caudill around that time. Onda stated that "[by] July 27, 2015, [he was] no longer represent[ing] Mr. Starner, individually." (Defs.' Ex. M; Onda Aff. at ¶ 15.)

{¶ 38} Onda continued to bill Starner for legal work he performed after July 27, 2015. However, Onda stated that all the work he performed after July 2015 was on behalf of the M5S entities rather than Starner.

{¶ 39} As an initial matter, we disregard Starner's affidavit testimony regarding the length of his attorney-client relationship with Onda. When deposed, Starner testified he hired Caudill "as opposed" to Onda and "everything" turned over to Caudill by mid-June 2015. This testimony conflicts with Starner's averment in his affidavit that he "continued to consult and receive advice from Onda" after he hired Caudill and "Caudill and Onda collaborated" in providing him representation throughout 2015. *Compare* Starner Depo. at 241-42 *with* Starner Aff. at ¶ 19.

{¶ 40} " '[W]hen an affidavit is inconsistent with [an] affiant's prior deposition testimony as to material facts and the affidavit neither suggests [the] affiant was confused at the deposition nor offers a reason for the contradictions in her prior testimony, the affidavit does not create a genuine issue of fact which would preclude summary judgment.' " *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 28, quoting *Lemaster v. Circleville Long Term Care, Inc.*, 4th Dist. No. 87 CA 2 (Feb. 22, 1988). Conceivably, some explanation may exist for the inconsistency we perceive between Starner's affidavit and deposition testimonies. Starner, however, makes no effort to offer such an explanation in his affidavit. Absent an explanation, we agree with the trial court that Starner's affidavit testimony regarding the length his attorney-client relationship with Onda warrants no consideration. *See Allen v. Dept. of Adm. Servs. Office of Risk Mgt.*, 10th Dist. No. 19AP-

729, 2020-Ohio-1138, ¶ 26 (disregarding affidavit testimony that conflicted with prior deposition testimony without explanation).

{¶ 41} Considering the remaining evidence in the record, we must determine whether, as defendants argue, Starner severed the attorney-client relationship with Onda when he hired Caudill. While retaining another attorney for representation in the same matter normally signals the termination of the attorney-client relationship, neither Starner nor Onda treated the hiring of Caudill as the end of their relationship. On June 15, 2015, Starner sent both Onda and Caudill an e-mail asking what he should do when he learned that Pack planned to shut down the M5S entities the next day. Onda replied: "The only thing you can do, *which is not what I am recommending without* [*Caudill's*] *input* and input from a bankruptcy attorney, is to exercise your rights under the security agreement and take back the stock and membership interests so that they can no longer act on behalf of the companies." (Emphasis added.) (Pls.' Ex. 9.) Thus, just as Starner later testified in his deposition, Onda worked cooperatively with Caudill for a period in advising Starner regarding the breach of the purchase agreement. The question, therefore, is how long this period of tandem representation continued. Starner testified in his deposition that he was unsure, but then said mid-June 2015. Onda, on the other hand, admitted that both he and Caudill were still representing Starner as late as July 10, 2015.

{¶ 42} The trial court found that an e-mail sent by Caudill on July 27, 2015 was telling evidence of the end date of Starner and Onda's attorney-client relationship. The trial court characterized this e-mail as "confirm[ing] that Onda no longer represented Starner in his individual capacity." (Sept. 6, 2022 Decision & Entry Granting Defs.' Mots. for Summ. Jgmt. at 14.) In the e-mail, Caudill wrote to another attorney, "I received your letter asking whether I represent Mr. Starner, the [M5S] entities or both. * * * I represent Jeff Starner individually and in his capacity as shareholder and member of the [M5S] entities." (Ex. A, Onda Aff.) As shown by the content of this e-mail, it only confirmed that *Caudill* represented Starner; it said nothing regarding whether *Onda* represented or did not represent Starner. Thus, the e-mail does not definitively establish the date on which Starner's attorney-client relationship with Onda terminated.

{¶ 43} We find more probative the billing records attached to Onda's affidavit. Although Onda claimed in his affidavit that all his billing entries after July 2015 reflect work performed for the M5S entities, the substance of certain entries belies this claim. The

February 1, 2016 bill shows that on December 30, 2015, Onda spent four hours "[r]eview[ing] all correspondence and emails, draft[ing] documents, [and] prepar[ing] [a] chronology and supporting documentation regarding waiver of due diligence and representations and warranties by Purchaser with regards to finances and conditions of assets. Forward[ed] to D. Caudill." (Ex. B, Onda Aff.) From this entry, it appears Onda reviewed and summarized his previous work negotiating and drafting the purchase agreement for Starner. Because Onda forwarded the resulting work product to Caudill, a reasonable person could infer he performed this work to further Starner's individual claims.

{¶ 44} The February 29, 2016 bill shows that on January 4, 2016, Onda "[r]eview[ed] and finalize[d] [an] affidavit in regard[ ] to [the] [c]ognovit [n]ote litigation matter." (Ex. B, Onda Aff.) On January 26, 2016, Onda "[r]eview[ed] information received from D. Caudill and R. Brunner" and "[p]repare[d] documents responding [to]/refuting claims made by Brunner." (Ex. B, Onda Aff.) Two days later, Onda had a "[m]eeting with Rick Brunner regarding [the] Rule 60B motion" and "[fo]llow[ed] up with D. Caudill." (Ex. B, Onda Aff.)

{¶ 45} These billings appear to relate to the action that Caudill filed on Starner's behalf to collect on the cognovit promissory note. On November 17, 2015, Merchants Holding filed a Civ.R. 60(B) motion in that action. Starner's memorandum contra to that motion, filed January 4, 2016, attached Onda's affidavit in support. Attorney Rick Brunner entered an appearance on behalf of Merchants Holding in the cognovit action on January 7, 2016.[4] These events in the cognovit action correlate with the actions reflected in the billing entries, suggesting Onda performed work for Starner with regard to the cognovit action.

{¶ 46} Finally, the May 12, 2016 bill includes an entry dated March 18, 2016 for "[c]onferenc[ing] with D. Caudill revising trial testimony" and "[r]eview[ing] files in preparation for testimony." (Ex. B, Onda Aff.) A second entry, dated March 21, 2016, reflects that Onda "[met] with D. Caudill [to] prepar[e] for trial testimony" and "[a]ttend[ed] trial to testify." (Ex. B Onda Aff.) These entries show that Onda worked with Caudill—who represented Starner individually—to prepare to testify about a matter on

---

[4] The court filings from the cognovit action are not in the record, but they are publicly accessible online. Therefore, we take judicial notice of them. *See Teays Valley Local School Dist. Bd. of Edn.*, 2023-Ohio-244, at ¶ 76 (appellate courts may take judicial notice of publicly accessible online records); *Ltd. Invest. Group Corp.*, 2022-Ohio-3657, at ¶ 46 (same); *Fipps*, 2022-Ohio-3434 at ¶ 2, fn. 1 (same).

which Onda maintained files. Consequently, a reasonable person could surmise that Onda billed Starner for taking part in an action Starner pursued in his individual capacity to recover against Merchants Holding or the Pack Investors.

{¶ 47} Potentially, these six billing entries could all relate to work Onda did for the M5S entities, as Onda claims in his affidavit. However, the entries include enough information to create an issue of fact as to whether Onda, in fact, performed the work in question for Starner, individually, and not the M5S entities. If Onda continued to perform legal work for Starner, then the attorney-client relationship could not terminate.

{¶ 48} The work in the billing entries occurred from December 15, 2015 to March 21, 2016. Starner filed his original complaint for legal malpractice on September 6, 2016. Consequently, if any of the entries reflects work performed for Starner individually, then Starner filed his complaint within one year of the end of the attorney-client relationship.

{¶ 49} In sum, we conclude that a genuine issue of material fact exists as to the date of the termination of the attorney-client relationship. *See Accelerated Sys. Integration, Inc. v. Ritzler, Coughlin & Swansiger, Ltd.*, 8th Dist. No. 97481, 2012-Ohio-3803, ¶ 57 (because the attorney continued to bill the client for work performed in connection with the particular transaction, the appellate court found a genuine issue of material fact existed as to when the attorney-client relationship terminated). The record includes evidence that could lead reasonable minds to conclude that the attorney-client relationship terminated less than one year before Starner filed his claim for legal malpractice. Consequently, the trial court erred in granting defendants summary judgment on Starner's legal malpractice claim.

{¶ 50} We next turn to the trial court's decision to grant summary judgment in defendants' favor on the M5S entities' claims for legal malpractice. The trial court entered summary judgment on these claims because it found Starner lacked standing to pursue legal malpractice claims on behalf of the M5S entities. In doing so, the trial court erred.

{¶ 51} Standing depends on whether a plaintiff has a sufficient personal stake in the litigation to obtain judicial resolution of the controversy. *Deutsche Bank Natl. Trust Co. v. Holden*, 147 Ohio St.3d 85, 2016-Ohio-4603, ¶ 20; *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 21. In the case at bar, defendants argued that Starner could not acquire standing to sue on behalf of the M5S entities by obtaining an assignment of the M5S entities' claims for legal malpractice. Defendants maintained that Ohio law prohibits the

assignment of legal malpractice claims, making the receiver's assignment of the M5S entities' claims to Starner void. The trial court agreed with defendants that the purported assignment failed and, thus, concluded that Starner lacked standing to sue on the M5S entities' behalf. Consequently, the trial court granted defendants summary judgment on the M5S entities' claims.

{¶ 52} For purposes of this appeal, we will assume, without deciding, that claims for legal practice are not assignable. As a result, the assignment is invalid and the M5S entities retained their legal malpractice claims against defendants.

{¶ 53} A party has standing to assert its own rights. *Util. Serv. Partners*, *Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, ¶ 49. As parties to this action, the M5S entities have standing to assert their own claims. The M5S entities do not need Starner to assert their claims on their behalf.

{¶ 54} We recognize that reasons may exist for the dismissal of the M5S entities from this action, including the fact that the M5S entities have been judicially dissolved. Although, on the other hand, the M5S entities may be proper parties given that dissolved corporations can sue on claims that existed prior to dissolution. R.C. 1701.88(B); 1706.471(C)(2). However, at this point, the M5S entities remain parties to this action. Consequently, we will treat them as parties.

{¶ 55} Because the M5S entities have standing, the trial court erred in granting summary judgment to defendants on the M5S entities' claims on the basis that Starner lacked standing to assert those claims. Starner did not need to prove standing to assert the M5S entities' claims when the M5S entities are also plaintiffs to this action and, thus, have their own standing.

{¶ 56} Finally, we turn to defendants' argument that alternative grounds exist to affirm the grant of summary judgment in their favor on Starner's claim for legal malpractice. Specifically, defendants contend that they did not breach any duty owed to Starner, and that Starner failed to offer any evidence that their actions proximately caused Starner any damage. Although defendants raised these arguments in the motion for summary judgment, the trial court declined to rule on them.

{¶ 57} While an appellate court reviews a trial court's summary judgment decision de novo, Civ.R. 56(C) "mandates that the trial court make the initial determination whether to award summary judgment; the trial court's function cannot be replaced by an

'independent' review of an appellate court." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992). Consequently, appellate courts generally do not address issues raised in a summary judgment motion, but not decided by the trial court. *Anderson v. Bright Horizons Children's Ctrs., L.L.C.*, 10th Dist. No. 20AP-291, 2022-Ohio-1031, ¶ 59; *Tower 10, L.L.C. v. 10 W Broad Owner, L.L.C.*, 10th Dist. No. 18AP-998, 2020-Ohio-3554, ¶ 52; *Peterson v. Martyn*, 10th Dist. No. 17AP-39, 2018-Ohio-2905, ¶ 51. Considering summary judgment arguments in the first instance on appeal effectively deprives the non-moving party of appellate review. *Anderson* at ¶ 59. Here, because the trial court did not rule on defendants' alternative arguments, we will not consider them.

{¶ 58} In summary, we conclude the trial court erred in granting summary judgment on Starner's claim and the M5S entities' claims for legal malpractice. Accordingly, we sustain Starner and the M5S entities' sole assignment of error.

## IV. Conclusion

{¶ 59} For the foregoing reasons, we sustain the sole assignment of error, reverse the judgment of the Franklin County Court of Common Pleas, and remand this matter to that court for further proceedings consistent with law and this decision.

*Judgment reversed and*
*cause remanded.*

BEATTY BLUNT, P.J., and DORRIAN, J., concur.

_____